**THE GOLAN FIRM**
Yvette Golan
Attorney in Charge
Texas Bar No. 24053229
S.D. Tex. No. 1439846
1919 Decatur St.
Houston, Texas 77007
Telephone:     (866) 298-4150, ext. 101
Facsimile:     (928) 441-8250
Email: ygolan@tgfirm.com


**REESE RICHMAN LLP**
Michael R. Reese (*pro hac vice to be filed*)
Kim E. Richman (*pro hac vice to be filed*)
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Telephone:     (212) 643-0500
Facsimile:     (212) 253-4272
Email: mreese@reeserichman.com
krichman@reeserichman.com

*Counsel for Plaintiff and the Proposed Class*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| URI GEDALIA and KIRA LEWIS, on behalf of themselves and all others similarly situated, | § § § § | |
| | § | Case No. 4:13-cv-3517 |
| Plaintiffs, | § § | |
| | § | **PLAINTIFFS' ORIGINAL CLASS ACTION PETITION** |
| v. | § § | |
| | § | **DEMAND FOR JURY TRIAL** |
| WHOLE FOODS MARKET SERVICES, INC., WHOLE FOODS MARKET DISTRIBUTION, INC., WHOLE FOODS MARKET, IP, L.P., WFM IP MANAGEMENT, INC., WFM PRIVATE LABEL, L.P., WFM PRIVATE LABEL MANAGEMENT, INC., and DOES 1-99, | § § § § § § § § § | |
| Defendants. | § § | |

1

Plaintiffs Uri Gedalia and Kira Lewis ("Plaintiffs"), on behalf of themselves and all others similarly situated, and by and through their undersigned counsel, allege the following based upon their own personal knowledge and the investigation of their counsel:

## NATURE OF THE ACTION

1.      This is a proposed class action against Whole Foods Market, Inc., and its responsible subsidiaries (collectively, "Whole Foods," as defined below) for false and misleading misrepresentations regarding the ingredients in its private label products (the "Falsely Labeled Products," as defined below).  Exhibit 1 hereto is a non-exhaustive list of the Falsely Labeled Products.

2.      Since its founding in 1980, Whole Foods has developed a reputation for being a credible and trustworthy retailer, offering information and advice to consumers desiring natural foods or organic foods or seeking to avoid certain food ingredients or allergens.

3.      Whole Foods promises its customers that "[a]ll foods and beverages carried in Whole Foods Market stores are natural and meet strict quality standards, meaning that they are free of artificial flavors, colors, sweeteners and preservatives."  *See* Exhibit 2.  Whole Foods openly barred the sale of any product containing an ingredient on Whole Food's publicized "Unacceptable Ingredient List."  *See* Exhibit 3.  As a result of these representations, Whole Foods profited handsomely.

4.      In an effort to capture a greater market share, lure more customers, and develop its own private label brand, Whole Foods became not just a food retailer and educator, but a food manufacturer.  Whole Foods' private label 365 Organic and 365 Everyday Value product lines now have over 2,600 Stock-Keeping Units ("SKU").

5.      Whole Foods' private label products sold well, benefiting from its promise of strict adherence to its "nothing artificial" quality standards and ban of "unacceptable ingredients."

6.      Many of Whole Foods' private label products are honestly labeled, cementing the trust it has developed with its customers.  Again, Whole Foods profits handsomely as a result.  In 2009, 2010, 2011, and 2012, 11% of its annual $10 billion in retail sales were from its private label brands.

7.      However, like a Trojan horse in the grocery cart, Whole Foods' private label product lines contain both honestly-labeled products and falsely labeled additive-laden and genetically modified foods.

8.      On product packages, online, in written brochures, and in advertisements, Whole Foods promises that its private label products are formulated to avoid genetically engineered ingredients.  For example, Whole Foods makes the following representation on many of its product packages:



9.      However, testing by an independent laboratory found that **more than 50%** of Whole Foods' 365 Everyday Value Corn Flakes were genetically modified.  Additional lab tests found that other Falsely Labeled Products contained agricultural products genetically modified with bacterial and viral genes.

10.      Despite Whole Foods' promise that its products contain "nothing artificial" and its purported enforcement of its "strict quality standards," the Falsely Labeled Products contain a spectacular array and substantial amount of artificial ingredients that federal law prohibits in organic foods.

11.      For example, of the thirty-seven ingredients in Whole Foods' 365 Organic Milk-Based Infant Formula, only seven are not artificial and are allowed in organic foods.  ***Twenty-***

*five* of the thirty-seven ingredients are prohibited from being in organic foods, and ***thirty*** of the thirty-seven ingredients are also artificial ingredients.

12.     Whole Foods' 365 Organic, 365 Everyday Value, and Whole Foods private label products contain a dizzying array of ingredients Whole Foods promised to never include in its foods, including artificial flavors, artificial colors, artificial preservatives, artificial additives, hazardous compounds, and even "unacceptable" ingredients Whole Foods promised to ban from its stores.

13.     For example, three of the ingredients in Whole Foods' 365 Organic Milk-Based Infant Formula are condemned in its "Unacceptable Ingredient List."  Many of the Falsely Labeled Products contain nitrates, irradiated ingredients, and other ingredients banned in its "Unacceptable Ingredient List."   Indeed, almost half of Whole Foods' private label 365 Everyday Value pastas contain artificial color.

14.     In the past, Whole Foods has yanked products for containing just one of the ingredients on the List.

15.     Among the "unacceptable" infant formula ingredients, Whole Foods adds synthetically created nucleotides (the base molecules of ribonucleic acid (RNA) and deoxyribonucleic acid (DNA)) and controversial DHASCO and ARASCO, hexane-extracted oils from lab-created fermented algae and fungus by Martek Biosciences Corp.

16.     Many of the ingredients added to Whole Foods' private label products are "safe" as food additives.  Yet Whole Foods did not simply claim that the Falsely Labeled Products are "safe."  Whole Foods fraudulently claimed that the Falsely Labeled Products are "organic," "natural" and/or contained "nothing artificial."  Whole Foods' misrepresentations are demonstrably false; Whole Foods injected ingredients into the Falsely Labeled Products that have been federally declared as synthetic compounds or require extensive processing techniques to produce to be safely used as a food additive.

17.     Consumers lack the ability to test or independently ascertain the accuracy of a food label, especially at the point of sale.  Reasonable consumers must and do rely on the food company to honestly report the nature of a food's ingredients.

18.     Food companies intend for consumers to rely upon their representations,  and reasonable consumers do in fact so rely.  The food company's representations are the only source of information consumers can use to make decisions concerning whether to buy and ingest packaged foods.

19.     As a result of its false and misleading labeling, Whole Foods was able to sell the Falsely Labeled Products to hundreds of thousands of consumers throughout the United States and to realize sizeable profits.

20.     Whole Foods' false and misleading representations and omissions violate state and federal law as detailed more fully below, including common law and state deceptive trade practice laws, including California's Unfair Competition Law and California's Consumers Legal Remedies Act.

21.     By deceiving consumers about the nature, quality, and/or ingredients of the Falsely Labeled Products as detailed herein, Whole Foods was able to command a premium price for the Falsely Labeled Products.  Whole Foods was also motivated to mislead consumers to take away market share from competing products, thereby increasing its own sales and profits.

22.     Plaintiffs bring this action to stop Whole Foods' misleading practices.


**JURISDICTION AND VENUE**

23.     This Court has personal jurisdiction over the parties in this case.  Plaintiff Gedalia is a citzen of Texas, and Plaintiff Lewis is a citizen of California and, by filing this Complaint, consent to this Court having personal jurisdiction over them.  Each defendant has sufficient minimum contacts with Texas to establish personal jurisdiction of this Court over that defendant, or otherwise purposefully avails itself of the laws of this State.  Each defendant's principal place of business is in Texas.

24.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from the state of citizenship of any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

25.     Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Falsely Labeled Products, occurred within this District.


## PARTIES

26.     Plaintiff Uri Gedalia is a surgeon residing in Houston, Texas, and he has no intention of changing his residence. Over the last two years, Plaintiff Gedalia purchased several Falsely Labeled Products at retail prices. For example, in January of 2013, he purchased Whole Foods' 365-brand "Real Dairy Whipped Topping" from Whole Foods Markets located in Houston, Texas. Over the past two years, he also regularly purchased varieties of Whole Foods' 365 Morning O's, Whole Foods' 365 French Toaster Sticks, Whole Foods' 365 Shortbread Cookies, Whole Foods' 365 Organic Almond Milk, Whole Foods' 365 Everyday Macaroni & Cheese, and various other 365 products. In doing so, he saw and relied upon the representation that the 365 Organic products were "ORGANIC" in deciding to purchase them. He reasonably believed the 365 Organic products were organic, as labeled and the "ORGANIC" representation was a significant reason for his purchase. He also relied upon Whole Foods' representations that all these products do not contain artificial additives and ingredients listed in Whole Foods' Unacceptable Ingredient List, and that all these products do not contain GMOs.

27.     However, contrary to Whole Foods' representation that the 365 Organic products were "organic", they contained ingredients not allowed in organic foods.  For example, Whole Foods' 365 Organic Almond Milk contains ingredients not permitted in organic foods, including: retinyl palmitate (a synthetic substance), ergocalciferol (an irradiated substance condemned in Whole Foods' Unacceptable Ingredient list), and dl-alpha tocopherol acetate (a synthetic preservative).

28.     Contrary to Whole Foods' representations that all its products contained "nothing artificial" and contained no ingredients it finds "unacceptable", the products he purchased contained numerous artificial ingredients, including ingredients that Whole Foods deems "unacceptable."  For example, the 365 Real Dairy Whipped Topping contains nitrous oxide (nitrate) an unacceptable ingredient for foods and also an environmental pollutant. The 365 Morning O's cereals contain irradiated ingredients (such as cholecalciferol), and nitrates (such as thiamine mononitrate, a nitrate that can accumulate in the body and cause kidney stones).  *See* Exhibit 1.  The 365 Morning O's also contain ferric orthophosphate, a substance the European Union has banned from being added to foods.

29.     Had Plaintiff Gedalia known at the time that the Falsely Labeled Products he purchased were not as promised but instead, contained artificial and other prohibited ingredients, he would not have purchased the products.

30.     Plaintiff Kira Lewis is a mother of two young children who resides in Encino, California, and she has no intention of changing her residence.  Plaintiff Lewis purchased several Falsely Labeled Products over the last several years at retail prices.  For example, in October 2012, she purchased the 365-brand "ORGANIC SOYMILK" in a 32-ounce container from Whole Foods Markets located in Studio City, CA and Sherman Oaks, CA.   Over the past four to six years, she also regularly purchased 365 Organic Soy-Based Infant Formula, 365 Organic Quack'n Bites Cheese Crackers, and 365 Organic Almond Milk, and various 365 Everyday products, including 365 Everyday Macaroni & Cheese.  In doing so, she saw and relied upon the representation that the 365 Organic products were "ORGANIC" in deciding to purchase them.

She reasonably believed the 365 Organic products were organic, as labeled, and the "ORGANIC" representation was a significant reason for her purchase.  She also relied upon Whole Foods' representations that all these products do not contain artificial additives and ingredients listed in Whole Foods' Unacceptable Ingredient List, and that all these products do not contain GMOs.

31.    However, contrary to Whole Foods' representation that the 365 Organic products were "organic," they contained ingredients not permitted in organic foods.  For example, the 365 Organic Soy-Based Infant Formula contained the following ingredients that are not permitted in organic foods: sodium selenite (a hazardous substance), taurine, cholecalciferol (an irradiated substance), calcium pantothenate, choline bitartrate, cyanocobalamin, ascorbyl palmitate (chemical preservative), l-carnitine, l-methionine, cupric sulfate, manganese sulfate, zinc sulfate (a hazardous and synthetic substance), niacinamide, pyridoxine hydrochloride, riboflavin (an artificial color), thiamine hydrochloride, retinyl palmitate, dl-alpha tocopherol acetate (a synthetic preservative), phytonadione, docosahexaenoic acid single cell oil ("DHASCO"), arachidonic acid single cell oil ("ARASCO"), potassium bicarbonate,  and beta-carotene (synthetic food coloring agent).  *See* Exhibit 1.

32.    Additionally, Whole Foods' 365 Organic Soymilk and 365 Organic Almond Milk contain ingredients not permitted in organic foods, including: retinyl palmitate (a synthetic substance), ergocalciferol (an irradiated substance condemned in Whole Foods' Unacceptable Ingredient list), and dl-alpha tocopherol acetate (a synthetic preservative).  The 365 Organic Soymilk also contains other ingredients not permitted in organic foods, including riboflavin (an artificial color), cyanocobalamin (a synthetic substance), and zinc sulfate (a hazardous and synthetic substance). *See* Exhibit 1.

33.    Contrary to Whole Foods' representations that all its products contained "nothing artificial" and contained no ingredients it finds "unacceptable," the products she purchased contained numerous artificial ingredients, including ingredients that Whole Foods deems "unacceptable."  For example, Whole Foods' 365 Organic Soy-Based Infant Formula contains

8

irradiated substances, artificial colors, and artificial flavors, all condemned as "unacceptable" in Whole Foods' Unacceptable Ingredient List.  Whole Foods' 365 Everyday Macaroni and Cheese contain nitrates and artificial colors, both condemned as "unacceptable" in Whole Foods' Unacceptable Ingredient List. Whole Foods' 365 Organic Soymilk and 365 Organic Almond Milk contain irradiated substances, deemed "unacceptable" in Whole Foods' List.  Whole Foods' 365 Organic Soymilk also contains artificial colors, an "unacceptable" ingredient in Whole Foods' List.  *See* Exhibits 1, 3.

34.     Other artificial ingredients in Whole Foods' "organic" soy-based infant formula includes: magnesium chloride (synthetic flavoring agent and adjuvant), biotin, mixed tocopherol concentrate (synthetic preservatives), calcium chloride (artificial sequestrant and firming agent), calcium phosphate (synthetic preservative), ferrous sulfate, potassium chloride (artificial flavor enhancer), potassium citrate (synthetic acidity regulator), potassium hydroxide (synthetic stabilizer and acidity regulator), folic acid (synthetic nutrient), sodium citrate (synthetic acidity regulator), ascorbic acid (chemical preservative), and inositol.  Other artificial ingredients in Whole Foods' "organic" soy milk include calcium carbonate (artificial color), sodium citrate (synthetic acidity regulator), and potassium citrate (synthetic acidity regulator).  Other artificial ingredients in Whole Foods' "organic" almond milk include tricalcium phosphate (synthetic preservative), potassium citrate (synthetic acidity regulator), xanthan gum (synthetic stabilizer). Whole Foods' 365 Organic Quack'n Bites Cheese Crackers contain disodium phosphate (artificial preservative), potassium acid tartrate, annatto (artificial color), and tocopherols (artificial preservatives).   Whole Foods' 365 Everyday Macaroni & Cheese contains additional artificial additives, including ferrous sulfate, thiamine mononitrate, riboflavin, folic acid, sodium phosphate, and yeast extract.  *See* Exhibit 1.

35.     Had Plaintiff Lewis known at the time that the Falsely Labeled Products she purchased were not as promised but, instead, contained artificial and other prohibited ingredients, she would not have purchased the products.

36.     Defendant Whole Foods Market Services, Inc., a Delaware corporation, is a wholly-owned subsidiary of Whole Foods Market, Inc.  Whole Foods Market Services, Inc., has its principal place of business at 550 Bowie St., Austin, Texas 78703.  Whole Foods Market Services, Inc., controls decisions relating to the design, development, advertising, and marketing of Whole Foods' private label line of products.  Whole Foods Market Services, Inc., directly and through its agents, has substantial contacts with and receives benefits and income from and through the States of Texas and California.

37.     Defendant Whole Foods Market Distribution, Inc., a Delaware corporation, is a wholly-owned subsidiary of Whole Foods Market, Inc., with its principal place of business in Texas.  Whole Foods Market Distribution, Inc.. distributes or causes to be distributed Whole Foods' private label line of products.  Whole Foods Market Distribution, Inc., directly and through its agents, has substantial contacts with and receives benefits and income from and through the States of Texas and California.

38.     Defendant Whole Foods Market IP, L.P., a Delaware limited partnership, is a wholly-owned subsidiary of Whole Foods Market, Inc., with its principal place of business in Texas.   Whole Foods' private label products identify Whole Foods Market IP, L.P. as the distributor of Whole Foods' private label line of products.  Whole Foods Market IP, L.P. also owns Whole Foods private label trademarks, including the 365 Everyday Value trademark. Whole Foods Market IP, L.P., directly and through its agents, has substantial contacts with and receives benefits and income from and through the States of Texas and California.

39.     Defendant WFM IP Management, Inc., a Delaware corporation with its principal place of business in Texas, is the general partner of Whole Foods Market IP, L.P. WFM IP Management, Inc., directly and through its agents, has substantial contacts with and receives benefits and income from and through the States of Texas and California.

40.     Defendant WFM Private Label, L.P., a Delaware limited partnership, is a wholly-owned subsidiary of Whole Foods Market, Inc., with its principal place of business in Texas. Whole Foods Private Label, L.P., is also responsible for Whole Foods' private label line of

products.  Whole Foods Private Label, L.P., directly and through its agents, has substantial contacts with and receives benefits and income from and through the States of Texas and California.

41.     Defendant WFM Private Label Management, Inc., a Delaware corporation with its principal place of business in Texas, is the general partner of WFM Private Label, L.P.  WFM Private Label Management, Inc., directly and through its agents, has substantial contacts with and receives benefits and income from and through the States of Texas and California.

42.     Collectively, the named defendants listed above are referred to herein as "Whole Foods."  Whole Foods is the world's leading retailer of natural and organic foods and America's first national "Certified Organic" grocer.   Whole Foods owns and retails its private label 365 Organic, 365 Everyday Value, and Whole Foods brand products.   Whole Foods markets, distributes, and sells its private label products throughout Texas, California, and nationwide.

43.     Plaintiffs are unaware of the true names and capacities of the defendants sued herein as DOES 1 through 99, and, therefore, sue these defendants by fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities of these fictitiously-named defendants when they are ascertained. Upon information and belief, plaintiffs allege that DOES 1 through 100 do business in Los Angeles, California, and its surrounding areas.   Upon information and belief, Plaintiffs allege that at all relevant times each of DOES 1 through 99 is the supplier, manufacturer, examiner, certifier, formulator, engineer, or reseller of the artificial ingredients,  or the agent, servant, partner, joint-venturer, co-venturer, principal, director, officer, manager, employee, affiliate, assignee, successor-in-interest, alter-ego, shareholder, or representative of Whole Foods, and was acting in such capacity in undertaking the actions herein complained of and alleged.


**SUBSTANTIVE ALLEGATIONS**

**WHOLE FOODS HOLDS ITSELF OUT AS A NATURAL AND ORGANIC FOODS BRAND AND PRODUCT MANUFACTURER**

44.     American consumers increasingly and consciously seek out "natural" ingredients in their packaged foods.  Once a small niche market, natural product sales through retail channels reached $65 billion in 2010, and continue to grow today.

45.     Consumers value "all natural" ingredients for a myriad of reasons, including perceived benefits of avoiding disease, attaining health and wellness, helping the environment, assisting local farmers, assisting factory workers who would otherwise be exposed to synthetic and hazardous substances, and financially supporting the companies that share these values.

46.     Hoping to capture this growing market, Whole Foods labels and advertises its products as "organic" or containing "nothing artificial," and makes other similar representations detailed fully below.

47.     Whole Foods also carefully cultivates its image as a healthy, eco-friendly, worker-friendly brand — the kind of company whose label claims can be trusted.  Whole Foods further markets itself as an expert source of information on all things organic and natural.  Further, Whole Foods markets itself as an expert in environmental programming and information, offering advice on sustainability and organic farming and broadcasting environmental videos.

## WHOLE FOODS FALSELY REPRESENTS THAT CERTAIN PRODUCTS IN ITS 365 ORGANIC PRIVATE LABEL BRAND ARE ORGANIC

48.     Whole Foods made false, misleading, and deceptive representations that some of the products in its private label 365 Organic line are organic by prominently labeling the product packages as "ORGANIC," when, in fact, the products are not organic because they contain ingredients that federal law does not permit in organic foods (collectively referred to as the "Falsely Labeled 365 Organic Products").[1]  *See* Exhibit 1.

---

[1] Whole Foods has discontinued offering some of the Falsely Labeled 365 Organic Products, has altered the packaging, has altered the ingredients, or has selectively marketed the products. Whole Foods also regularly introduces new products that are also falsely labeled as "ORGANIC."  The identity of these additional products will be ascertained through discovery, and these products are hereby included in the list of "Falsely Labeled 365 Organic Products" at issue in this action.

49.     These misrepresentations were uniform and were communicated to Plaintiffs and every other member of the Class at every point of purchase and consumption.

50.     The "ORGANIC" representation on each of the Falsely Labeled 365 Organic Products is false.  The Falsely Labeled 365 Organic Products contain ingredients that federal law does not permit in organic foods.   The Falsely Labeled 365 Organic Products are thus not "organic" under federal law, and labeling them as such is misleading and deceptive under state law.

51.     Such ingredients include, by way of example:

a.      ***Adenosine-5'-Monophosphate   ("AMP");  cytidine-5'-monophosphate ("CMP");  disodium  guanosine-5'-monophosphate  ("GMP");  disodium  inosine-5'-monophosphate  ("IMP");  disodium  uridine-5'-monophosphate  ("UMP")).***     These  five compounds are *nucleotides*, the base molecules of ribonucleic acid (RNA) and deoxyribonucleic acid (DNA).   Upon information and belief, the nucleotides added to the Falsely Labeled 365 Organic Products are synthetically extracted from the RNA in yeast by enzymatic hydrolysis and synthetic filtration, hydrochloric acid.   Nucleotides are added to Whole Foods' 365 Organic products, including Whole Foods' 365 Organic Milk-Based Infant Formula.   Human breast milk contains relatively high concentrations of four of the five nucleotides (cytidine, uridine, adenosine, and guanosine), but has little to no inosine, the fifth nucleotide in Whole Foods' 365 Organic Milk-Based Infant Formula.

b.      Nucleotides are not permitted in organic foods. In fact, in October 2012, the USDA specified that nucleoties are not permitetd in organic infant formulas.  Nonetheless, Whole Foods adds nucleoties to its so-called "organic" infant formulas.

c.      Additionally, Whole Foods lists both GMP and IMP as ingredients it finds unacceptable in food products.  *See* Exhibit 3.   Nevertheless, both ingredients are in its 365 Organic Milk-Baed Infant Formula.

d.      The Food and Drug Administration ("FDA") has never affirmed any of the nucleotides as generally recognized as safe ("GRAS") as a food additive.   One ingredient

supplier determined that one of the nucleotides, AMP, is generally recognized as safe as a food ingredient, and it has been used as an artificial flavor enhancer due to its strong unami-like flavor.   FDA Agency Response Letter GRAS Notice No. GRN 000144.   However, no supplier has filed a similar determination that any of the other four nucleotides are generally recognized as safe as a food ingredient.

       e.     ***Sodium Selenite*** is classified by federal regulations as a hazardous substance.  The FDA has not recognized it as generally recognized as safe as a food additive, but it is approved for use as an animal feed additive. The European Union has classified sodium selenite as very toxic and dangerous for the environment.  It is very hazardous when ingested. Even at very low doses, animal studies show it has negative respiratory effects, gastrointestinal effects, broad systemic effects, cardiovascular effects, metabolic effects, and liver effects.  It is not permitted to be added to foods labeled as "organic."  Nonetheless, Whole Foods has added it to the Falsely Labeled 365 Organic Products, such as 365 Organic Milk-Based Infant Formula and 365 Organic Soy-Based Infant Formula.  *See* Exhibit 1.

       f.     ***Taurine***, a.k.a. 1 2-aminoethanesulfonic acid, is not permitted to be added to foods labeled as "organic." In fact, the National Organic Standards Board specifically rejected applications to permit taurine to be added to organic foods.   Even at very low doses, animal studies show negative brain and nervous system effects, metabolic effects, and cardiovascular effects.  Commercially available taurine is synthetically produced by reacting ethylene oxide with aqueous sodium bisulfate, reacting aziridine with sulfurous acid, or reacting monoethanolamine, sulfuric acid, and sodium sulfite.  Both sodium sulfite and ethylene oxide are on Whole Foods' list of "Unacceptable Ingredients."  *See* Exhibit 3.   The FDA has not affirmed taurine as safe in foods or infant formulas.

       g.     ***Docosahexaenoic acid single cell oil***, a.k.a. "DHASCO," in Whole Foods' 365 Organic Baby Formula in the form of crypthecodinium cohnii oil.  It is not permitted in organic foods.  Martek Biosciences Corp. produces crypthecodinium cohnii oil as a by-product from the marine dinoflagellate *C. cohnii*, a nonagricultural microorganism. Such by-

14

products from nonagricultural microorganisms (like DHASCO) are not permitted in organic foods. Martek Biosciences Corp. uses hexane (a volatile synthetic solvent and toxic pollutant) to extract DHASCO from the unicellular microalgae, and it adds ascorbyl palmitate (a synthetic substance) to the final byproduct for oxidative stability.  As much as 77% of the final DHASCO contains other triglycerides, including: myristic acid (13-20%); palmitic acid (12-25%); oleic acid (10-25%), lauric acid (2-6%), and capric acid (1%).   None of these compounds are permitted in organic foods.

       h. **_Arachidonic acid single cell oil,_** a.k.a. "ARASCO," in Whole Foods' 365 Organic Baby Formula in the form of mortierella alpine oil.  It is not permitted in organic foods. Mortierella alpine oil is a by-product from _M. alpina_, a soil fungus, and therefore not permitted in organic foods.  Like DHASCO, ARASCO is produced using hexane extraction and ascorbyl palmitate to preserve oxidative stability.  The product is therefore not permitted in organic foods. As much as 64% of the final ARASCO ingredient contains other fatty acids, including oleic acid (~16–23%), palmitic acid (~7–10%), stearic acid (~7–10%), linoleic acid (~6–8%), gamma-linoleic acid (~3%), dihomo-gamma-linoleic acid (~1–3%), behenic acid (~2%), and a number of other fatty acids at levels less than one percent.   None of these compounds are permitted in organic foods.

       i. **_L-carnitine_** is not permitted in organic foods.  In fact, in October 2012, the USDA specified that l-carnitine is not permitetd in organic infant formulas.  Nonetheless, Whole Foods adds the substance to its so-called "organic" infant formulas.  L-carnitine is usually synthesized using epichlorhydrine or trimethylamine, and racemate separation by fractionated crystallization or other methods.  L-carnitine can also be obtained from industrially-produced D-mannitol.  L-carnitine can also be produced using commercially available biosynthetic methods via microorganisms (e.g., _Escherichia coli, Proteus mirabilis_) cultivated in a bioreactor with crotonobetaine, crotonobetaine salts, or its derivatives.

       j. **_Dl-alpha tocopherol_** is not permitted in organic foods.   By federal regulations, it is synthetically produced by condensing racemic isophytol with trimethyl

hydroquinone.   Dl-alpha tocopherol is a mixture of stereoisomers of 2,5,7,8-tetramethyl-2-(4′,8′,12′-trimethyl-tridecyl)-6-chromanol.   The substance has approximately half the vitamin activity of natural vitamin E.   The FDA has limited the use of dl-alpha tocopherols, and they are generally recognized as safe only in bacon products or to inhibit nitrosamine formation.[2] Nitrosamine forms only in the presence of nitrites — a substance Whole Foods condemns in its "Unacceptable Ingredient List."  *See* Exhibit 3.

k.      ***L-methionine*** is also not currently permitted in organic foods. There are no commercial sources of nonsynthetic L-methionine.   According to the USDA, most L-methionine is produced from DL-methionine, which is itself a synthetic substance produced by reacting acrolein with methyl mercaptan; by reacting propylene, hydrogen sulfide, methane, and ammonia to make the intermediates acrolein, methylthiol, and hydrocyanic acid; by the Strecker synthesis method with α-methylthiopropionaldehyde as the aldehyde; or by reacting 3-methylmercaptopropionaldehyde with ammonia, hydrogen cyanide, and carbon dioxide.   The resulting DL-methionine is further processed to produce L-methionine by using optical resolution, resulting in separation into the D- and L- enantiomers, or by acetylation of synthetic DL-methionine and subsequent enzymatic selective deacetylation of the N-acetylated L-methionine.

l.      ***Ascorbyl palmitate*** is classified by federal regulations as a chemical preservative.  It is not permitted in organic foods.  In fact, in October 2012, the USDA specified that ascorbyl palmitate is not permitetd in organic infant formulas.   Nonetheless, Whole Foods adds ascorbyl palmitate to its so-called "organic" infant formulas.   Ascorbyl palmitate is prepared by condensing palmitoyl chloride and ascorbic acid in the presence of a dehydrochlorinating agent such as pyridine.   It can also be produced by the esterification of ascorbic acid with sulfuric acid, where the product of that reaction is esterified with palmitic

---

[2] Dl-alpha tocopherols are also allowed in bacon products, a usage that is inapplicable to Whole Foods' many non-bacon private label goods containing dl-alpha tocopherols.

acid.  Other patented processes use dimethylformamide, dimethyl sulfoxide, or hydrogen fluoride instead of sulfuric acid.

m.      According to federal regulations, **calcium pantothenate** is synthetically prepared from isobutyraldehyde, a synthetic flavoring substance and toxic chemical, and formaldehyde, a hazardous substance, via 1,1-dimethyl-2-hydroxy-propionaldehyde and pantolactone.  It is not allowed in organic foods.  Calcium pantothenate ($C_{18}H_{32}CaN_2O_{10}$), represented graphically as follows:



is not the same substance as vitamin B5 ($C_9H_{17}NO_5$), represented graphically as follows:



n.      **Choline bitartrate** is a synthetic substance produced by the reaction of trimethylamine with ethylene oxide followed by treatment with tartaric acid.  Trimethylamine and tartaric acid are both hazardous substances under federal law. Choline bitartrate is not the same substance as choline, an ingredient permitted in organic non-milk-based infant formulas. Choline bitartrate ($C_9H_{19}NO_7$) is a synthetic variation of choline ($C_5H_{14}NO$), a nutrient naturally found in grains, nuts, and beans.  It is not allowed in organic foods.

o.      Similarly, **choline chloride** is a synthetic substance produced by reacting trimethylamine and concentrated hydrochloric acid (both hazardous substances), followed by

treatment with ethylene oxide under pressure.  Choline chloride ($C_5H_{14}ClNO$) is also not the same substance as the nutrient choline ($C_5H_{14}NO$).  While choline chloride is permitted in soy-based infant formula, it is prohibited in other foods labeled as organic, including Whole Foods' 365 Organic Milk-Based Infant Formula.

        p.     ***Cyanocobalamin*** is a synthetic compound produced commercially from cultures of *Streptomyces griseus*.  Cyanocobalamin ($C_{63}H_{88}CoN_{14}O_{14}P$) is chemically and molecularly distinct from natural vitamin B12 (cobalamin, $C_{62}H_{88}CoN_{13}O_{14}P$), found in animal foods such as fish, liver, poultry, eggs, and milk products.  Cyanocobalamin does not give the human body the full range of vitamin activity found in natural vitamin B12. Unlike natural vitamin B12, the body converts cyanocobalamin to methylcobalamin and adenosylcobalamin, leaving the body to enzymatically remove the resulting cyanide, potentially harmful to those who are deficient in this ability.  It is not allowed in organic foods.

        q.     By federal regulation, ***ergocalciferol*** is a synthetic compound produced by ultraviolet irradiation of ergosterol isolated from yeast and is purified by crystallization.  Whole Foods has added it to its rice milks, almond milks, and flax milks, despite federal regulation specifying that it may be used only in soy beverage products, and soy-based butter substitute spreads, and soy-based cheese substitutes. Irradiation is an extremely unnatural process that Whole Foods admits is unacceptable for its foods.  *See* Exhibit 3.  Ergocalciferol is not allowed in organic foods.

        r.     ***Cholecalciferol*** is also a synthetic compound.  Cholecalciferol can be produced from fish liver oils, but Whole Foods' labels do not indicate that any ingredient was derived from seafood.[3]  By federal regulation, the other method of production requires ultraviolet irradiation of ergosterol isolated from yeast and related fungi and  purified by crystallization, or

---

[3] Whole Foods explains, "[w]hen any of the regulated allergens (milk, eggs, fish, crustacean shellfish, peanuts, tree nuts, wheat, or soy) are included in the natural flavors or spices, it is labeled according to The Food Allergen Labeling and Consumer Protection Act."  Exhibit 13.

ultraviolet irradiation of 7-dehydrocholesterol produced from cholesterol. Irradiation is an extremely unnatural process that Whole Foods admits is unacceptable for its foods. *See* Exhibit 3. Cholecalciferol is not allowed in organic foods.

   s. ***Cupric sulfate*** is not permitted in organic products. According to federal regulations, it is a synthetic substance produced by dissolving oxidized copper in sulfuric acid before purification.

   t. According to federal regulations, ***folic acid*** is the synthetically-created chemical N-[4-[[ (2-amino-1,4-dihydro-4-oxo-6-pteridinyl)methyl]amino]benzoyl]-L -glutamic acid. Folic acid is permitted in organic infant formulas, but is not permitted in other foods labeled as organic. Folic acid differs from natural folate in numerous respects, including shelf-life and bio-availability. Even the molecular structure of folic acid is different from the natural folate. The molecular structure of folic acid is represented graphically as follows:



By contrast, natural folates have different chemical structures, represented graphically as follows:

Tetrahydrofolate



10-Formyltetrahydrofolate



5,10-Methylenetetrahydrofolate

5-Methyltetrahydrofolate

u. ***Niacinamide*** is the chemical 3-pyridinecarboxylic acid amide (nicotinamide). It is a synthetic substance. It is usually prepared by esterifying nicotinic acid with methanol, followed by ammonolysis. It is alternately prepared by passing ammonia gas (a hazardous substance) into molten nicotinic acid or from partial hydrolysis of 3-cyanopyridine. While niacinamide is permitted in organic infant formulas, it is not permitted in other foods labeled as organic. Niacinamide ($C_6H_6N_2O$), represented graphically as follows:



is not the same substance as niacin (vitamin B3, $C_6H_5NO_2$), represented graphically as follows:

21



      v.     ***Phytonadione*** is 2-methyl-3-phytyl-1, 4-naphthoquinone, synthetically produced from 2-methyl-1,4-naphthoquinone and phytol, or from the partial syntheses from menadione and phytol, using a pi-allylic nickel(I) complex.  Phytonadione is not the same substance as vitamin K (phylloquinone), a nutrient permitted in organic infant formulas. Phylloquinone (vitamin K1), IUPAC Standard InChIKey: MBWXNTAXLNYFJB-LKUDQCMESA-N, has different stereochemistry bonds than the synthetic phytonadione in Whole Foods' products.  Phylloquinone has the following structure:



The synthetic substance in Whole Foods' Falsely Labeled Products, phytonadione, IUPAC Standard InChIKey: MBWXNTAXLNYFJB-JHBCSKSVSA-N, has different stereochemistry bonds:



       w.    **Pyridoxine hydrochloride** is a synthetic compound not permitted in organic foods. Pyridoxine hydrochloride ($C_8H_{12}ClNO_3$) is not the same substance as vitamin B6 (pyridoxine) ($C_8H_{11}NO_3$). Pyridoxine hydrochloride is synthesized by the condensation of cyanoacetamide with ethoxyacetylacetone in the presence of piperidine, 2-butanone-1,4-diol & alpha-methyliminopropionitrile and/or other substances. Alternatively, it is synthesized from ethyl pyruvate, ethyl glycinate, & 1,4-diethoxy-2-butanone, and other substances.

       x.    According to federal regulations, **thiamin hydrochloride** is a synthetic compound prepared by linking preformed thiazole and pyrimidine ring systems. It is not permitted in organic foods. It is chemically distinct from thiamine (vitamin B1), which has the molecular formula $C_{12}H_{17}ClN_4OS$. By contrast, thiamin hydrochloride is $C_{12}H_{18}Cl_2N_4OS$.

       y.    **Thiamine mononitrate** ($C_{12}H_{17}N_5O_4S$) is the mononitrate salt of thiamine. It is chemically distinct from thiamine (vitamin B1), $C_{12}H_{17}ClN_4OS$. By federal regulation, thiamine mononitrate is a synthetic substance prepared from thiamine hydrochloride (also synthetic) by dissolving the hydrochloride salt in alkaline solution followed by precipitation of the nitrate half-salt with a stoichiometric amount of nitric acid. The nitrates present in thiamine mononitrate may accumulate in the kidneys, inducing kidney stones or cellular death. Nitrates

are among the compounds that Whole Foods lists on its Unacceptable Ingredient List.  *See* Exhibit 3.  Thiamine mononitrate is not allowed in organic foods.

       *z.*     **Retinyl palmitate,** listed in Whole Foods' private label products as "vitamin A palmitate" is prepared by esterifying retinol with palmitic acid. It is a synthetic substance not permitted in organic foods.  Retinyl palmitate, $C_{36}H_{60}O_2$, represented graphically as:



It is chemically different from the natural vitamin A existing in foods, retinol, $C_{20}H_{30}O$, represented graphically as:

aa.     ***Lactase enzymes*** are prepared by yeast, which converts lactose to glucose and galactose.  Lactase enzymes are not from an approved enzyme source under 7 C.F.R. § 205.605(a), and are not permitted in organic foods.

bb.     ***Manganese sulfate*** is a synthetic compound. It is obtained by reacting manganese compounds with sulfuric acid (a hazardous substance).  It is also obtained as a byproduct of the manufacture of hydroquinone (a toxin).  Other manufacturing processes include the action of sulfur dioxide on a slurry of manganese dioxide in sulfuric acid, and the roasting of pyrolusite ($MnO_2$ ) ore with solid ferrous sulfate (a hazardous substance) and coal, followed by leaching and crystallization. Manganese sulfate is not allowed in organic foods.

cc.     ***Zinc sulfate*** is produced by reacting zinc oxide with sulfuric acid (a hazardous compound).  Federal law classifies it as a hazardous and synthetic substance. It is not allowed in organic foods.

dd.     ***Potassium bicarbonate*** is a synthetic acidity regulator.  By federal regulation, it is made by treating a solution of potassium hydroxide or potassium carbonate (both synthetic substances) with carbon dioxide.  It is not allowed in organic foods.

ee.     ***Inositol*** and ***biotin*** are prohibited from organic foods, except soy-based infant formulas.  Nonetheless, Whole Foods adds boith to its so-called "organic" milk-based infant formulas.

25

ff.　　　According to the USDA, nonsynthetic production methods of inositol are not available on a commercial scale.  It is produced by extracting phytic acid (inositol-hexaphosphate) from plants such as corn or rice by soaking in a dilute acid solution, such as hydrochloric acid or sulfuric acid, creating phytin (inositol-hexaphosphate salt).  The phytin is synthetically converted to inositol by hydrolysis with a strong sulfuric acid solution, and then purified with a reagent like barium to remove the sulfuric acid, phosphoric acid, and calcium or mangesium sulfate.  Alternatively, it can be prepared from phytin using ammonium salts such as ammonium sulfate, ammonium chloride, ammonium nitrate, ammonium acetate, or ammonium phosphate for hydrolysis.

gg.　　　***Beta-carotene*** is classified by federal regulations as a synthetic food coloring agent.  Beta-carotene is isolated from natural sources using column chromatography and separation by non-polar solvents such as hexane (a synthetic neurotoxin and environmental hazard).  Beta-carotene is not the same substance as vitamin A.  Vitamin A (retinol) is $C_{20}H_{30}O$, represented graphically as follows:

Beta-carotene, by contrast, is C$_{40}$H$_{56}$, represented graphically as follows.



    hh.    Beta-carotene operates on the human body differently than natural vitamin A.   For example, some studies indicate that beta-carotene supplementation increases the probability of lung cancer in cigarette smokers.

    ii.    In its synthetic form, beta-carotene is not allowed in organic foods. In fact, in October 2012, the USDA specified that beta-carotene is not permitetd in organic infant

formulas.   Nonetheless, Whole Foods adds beta-carotene to its so-called "organic" infant formulas.

52.     Further inducing consumers to rely on the deceptive representation that the Falsely Labeled 365 Organic Products  are "ORGANIC," Whole Foods did not label other private label 365 products as "ORGANIC," leading consumers to believe that Whole Foods carefully studied each of its products' ingredients to ensure that the "ORGANIC" claim is made only on those products that are truly organic.

## WHOLE FOODS FALSELY PROMISES ITS PRIVATE LABEL PRODUCTS CONTAIN NO GENETICALLY MODIFIED ORGANISMS

53.     Whole Foods' carefully orchestrated GMO marketing strategy plays on consumers' fears and uncertainties, enabling it to sell more of its private label products.

54.     First, Whole Foods proclaims that its goal is "to provide informed consumer choice with regard to genetically engineered ingredients."  Exhibit 4.

55.     Whole Foods then warns consumers that GMOs are "pervasive;" "[w]ith regard to our North American food supply, approximately 93% of soy, 88% of field corn, 94% cotton, and over 90% of canola seed and sugar beets planted in the U.S. (2012 data) are genetically engineered."  Further, Whole Foods warns consumers that a product label will not necessarily disclose that the product contains GMOs.  Moreover, Whole Foods warns consumers that some GMO-containing products are even sold on Whole Foods' shelves.  *See* Exhibit 5.

56.     After explaining the near-impossibility of identifying whether a product contains GMOs, Whole Foods counsels consumers desiring to avoid GMOs that they can simply buy its private label products:

**What can I do to avoid GMOs in the grocery store?**

- **Choose organic products.** …

- Buy our **365 Everyday Value® products**.  All ingredients derived from plants are sourced to avoid GMOs, and hundreds of those products **are verified by the Non-GMO Project**.

Exhibit 5 (emphasis in original).  *See also* Exhibit 4.

57.     Whole Foods repeats this promise on its website and through in-store brochures and flyers.  "Our 365 Everyday Value® and Whole Foods Market™ brand products are sourced to avoid ingredients grown from genetically engineered seed . . ." Exhibits 6, 7.

58.     On some product packages, Whole Foods repeats the promise that "365 Everyday Value products are formulated to avoid genetically engineered ingredients."  *See* Exhibit 8.

59.     Whole Foods also trains its store employees to tell consumers that all 365 Everyday Value products and Whole Foods branded products are free from genetically modified organisms ("GMOs").  Whole Foods further awards bonuses to store employees based upon the sales in that employee's store — up to nineteen times the average annual wage.

60.     These representations are false, at least as to some Whole Foods private label products (the "Falsely Labeled GMO Products").

61.     For example, a Cornucopia Institute study found that Whole Foods' 365 Everyday Value products were contaminated with high levels of genetically engineered ingredients — specifically, Whole Foods' 365 Everyday Value Corn Flakes contained more than 50% genetically engineered corn.  *See* Exhibit 9.  Testing done by independent labs, including one hired by Plaintiffs' counsel,confirms that other 365 Everyday products also contain GMO ingredients.  Additional Falsely Labeled GMO Products will be identified through discovery.

62.     Whole Foods was one of the founders of the Non-GMO Verified Project, a fact it repeatedly advertises while trying to bolster its representations that all its private label products are free of GMOs.  *See, e.g.,*  Exhibit 6.

63.     Knowing consumers trust the Non-GMO Verified Project, Whole Foods boldly touts that "All of our 365 Everyday Value® food products are enrolled in the Project. . . ."  Ex. 4.

64.     Whole Foods conceals the difference between being "enrolled" in the Project and being "verified" by the Project.  Being "enrolled" in the Project only means that they have agreed to allow the Project to test the product at some point – it does not mean that the product has been verified, or that the product satisfies the Project's compliance requirements.  Being

"enrolled" requires only that the food company provide limited initial data, sign a non-disclosure agreement, and pay enrollment fees.   Product-specific information, such as ingredient lists, production facility information, test results, and other information that would allow the Project to verify Whole Foods' "non-GMO" representations are not shared at the "enrollment" stage.

65.     In fact, only a fraction of Whole Foods' private label products are verified by the Non-GMO Project, one of the most credible and reputable organic non-profit organizations.

66.     By linking the Whole Foods brand with the Non-GMO Project, Whole Foods knows that consumers will falsely believe that its "non-GMO" claims on its private label products has the support or endorsement of the Non-GMO Project.

67.     Whole Foods holds itself out as taking the responsibility of keeping records for the accuracy of the "organic" seal on its foods.  For example, Whole Foods makes the following representation to consumers:

> **Let's stop playing with our food**
>
> ... To be certified as organic, a farm must keep records of its practices and products used, and as a national certified organic grocer (the first national retailer to earn the title!), so must we.  Organic remains our #1 recommendation for protecting the health of the planet and all its inhabitants. …

Exhibit 6 (emphasis in original).  *See also* Exhibit 10.

68.     Whole Foods explains it became a certified organic grocer "to give our customers more trust in the organic label. For us, it's important for you to know that *everyone* who handles your organic food has been certified - instead of everyone *but* the retailer."  Exhibit 11.

## WHOLE FOODS FALSELY PROMISES ITS PRODUCTS CONTAIN NO INGREDIENTS LISTED IN ITS "UNACCEPTABLE INGREDIENT" LIST

69.     As part of the "quality standards" it promises for all its products, Whole Foods promises its customers that its foods do not contain any of the ingredients listed on its publicly available list of "Unacceptable Ingredients for Foods."  Exhibits 3, 12, 13.

70.    This Unacceptable Ingredient List includes the worst-of-the-worst ingredients that consumers adamantly try to avoid, such as monosodium glutamate ("MSG"), irradiated ingredients, nitrites, nitrates, and others.  Exhibit 3.

71.    The Unacceptable Ingredient List also includes ingredients that consumers may not have heard about, but are deleterious to their health and/or the environment.

72.    Whole Foods takes its "Unacceptable Ingredients for Foods" list seriously. Whole Foods uses the List to ban competing products from being sold in its stores and to yank competing products from its shelves that do not meet its requirements.

73.    For example, in a highly publicized attempt to regain consumer confidence, Whole Foods yanked Skinnygirl Margarita Mix from the shelves of 16 of its stores, explaining "After discovering that it contains a preservative [sodium benzoate] that does not meet our quality standards, we have had to stop selling it."

74.    Whole Foods' "unacceptable ingredient" representation is false.  In fact, many of the products in its private label 365 Organic, 365 Everyday Value, and its Whole Foods brand product lines contain one or more of these Unacceptable Ingredients (collectively, the "Falsely Labeled Unacceptable Ingredient Products," including but not limited to the products identified in Exhibit 1).[4]

75.    In just one startling example, Whole Foods' 365 Organic Infant Formula contains three ingredients Whole Foods condemns as "unacceptable," including:  ***disodium guanosine-5'-monophosphate ("GMP"); disodium inosine-5'-monophosphate ("IMP");*** and ***cholecalciferol*** (irradiated).

76.     Other Whole Foods' 365 Organic, 365 Everyday Value, and Whole Foods product lines also contain additional ingredients that Whole Foods condemns as "unacceptable,"

---

[4] Whole Foods has discontinued offering some of the Falsely Labeled Unacceptable Ingredient Products, has altered the ingredients of some, and might introduce new products that contain one or more ingredients found on its Unacceptable Ingredient List and that, therefore, are hereby included in the list of "Falsely Labeled Unacceptable Ingredient Products" at issue in this action. The identity of these additional products will be ascertained through discovery.

including by way of example and without limitation: *ergocalciferol* (irradiated); *thiamine mononitrate* (a nitrate); *glyceryl monostearate* and *glyceryl distearate,* a.k.a. "mono- and diglycerides of fatty acids," produced from completely hydrogenated fats,  and a slew of *artificial colors* and *artificial flavors* (see allegations above and below).

## WHOLE FOODS FALSELY PROMISES CONSUMERS THAT ITS PRODUCTS CONTAIN "NOTHING ARTIFICIAL"

77.     Whole Foods publicly and prominently promises that its foods are natural and free of artificial additives:

> All foods and beverages carried in Whole Foods Market stores are natural and meet strict quality standards, meaning that they are free of artificial flavors, colors, sweeteners and preservatives.

*See, e.g.,* Exhibit 2.

78.     Whole Foods tells consumers that they need not read ingredient labels to confirm Whole Foods' representation.  For example, Whole Foods reassures consumers:

> To keep what we put on our plates as natural as possible, Whole Foods Market is committed to selling food that is free of artificial preservatives, colors, flavors and sweeteners as well as hydrogenated fats.  *All of the food that we sell meets that standard.  No label reading required*.

Exhibit 14 (emphasis added).  *See also* Exhibit 15.

79.    Whole Foods repeats this mantra on some product packages and in-store signage, such as this large outdoor mural proclaiming "Nothing Artificial, Ever."



As recently as June 2013, the in-store signage at the Whole Foods store at 701 Waugh Dr., Houston, Texas declares: "NOTHING ARTIFICIAL … EVER, EVER, EVER."





Similarly, Whole Foods paints its trucks with more assurances, such as "100% Real Ingredients."



And a 6-foot-tall in-store sign repeats the Whole Foods' mantra:



*See* Exhibit 16.

80.     Whole Foods' condemnation of artificial additives is not just an aspirational goal. Whole Foods explicitly promises consumers: "Our quality standards for food ***prohibit*** the use of artificial colorings, flavorings, preservatives, hydrogenated oils, high fructose corn syrup and other specific ingredients."  Exhibit 5 (emphasis added).

81.     Representing that a food product or ingredient is "natural" or contains "nothing artificial" is a statement of fact, and these terms have been defined by the federal governmental agencies that regulate food companies such as Whole Foods.

82.     In signed federal filings, Whole Foods defines "natural" as "foods that are minimally processed, largely or completely free of artificial ingredients, preservatives and other non-naturally occurring chemicals and as near to their whole, natural state as possible." Whole Foods 2011 Annual Report at 4.

83.     Whole Foods also defines "natural" on its website, explaining that it "means that the product has undergone minimal processing."  Exhibit 2.

84.     The term "natural" has also been at least partially defined by federal agencies and regulations.  The FDA has defined the outer boundaries of the use of the term "natural" by stating that a product is not natural if it contains synthetic or artificial ingredients.[5]  Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defines a "natural" product as a product that does not contain any artificial or synthetic ingredient and does not contain any ingredient that is more than "minimally processed."

85.     According to USDA federal regulations, an ingredient is synthetic if it is:

---

[5] *See* FDA Consumer Health Information, Food Label Helps Consumers Make Healthier Choices, available at

www.fda.gov/downloads/ForConsumers/ConsumerUpdates/UCM199361.pdf.

[a] substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes.

7 C.F.R. § 205.2.

86.     A reasonable consumer's understanding of the term "natural" and "nothing artificial" comports with federal law and Whole Foods' proffered definition.   A reasonable consumer would expect that when Whole Foods promises that all its products are "natural," the products' ingredients are "natural" as defined by federal agencies, which govern Whole Foods, as well as by Whole Foods' own published definition of "natural."

87.     Whole Foods' "nothing artificial" representation is false.   In fact, many of the products in its private label 365 Organic, 365 Everyday Value, and its Whole Foods brand product lines contain one or more artificial ingredients (collectively, the "Falsely Labeled Artificial Ingredient Products," including but not limited to the products listed in Exhibit 1).[6]

88.     Whole Foods Artificial Ingredient Products contain one or more of the following ingredients, including but not limited to:

a.     *Adenosine-5'-monophosphate ("AMP"); cytidine-5'-monophosphate ("CMP"); disodium guanosine-5'-monophosphate ("GMP"); disodium inosine-5'-monophosphate ("IMP"); disodium uridine-5'-monophosphate ("UMP"); sodium selenite; taurine; docosahexaenoic acid single cell oil; arachidonic acid single cell oil; dl-alpha tocopherol; l-methionine; l-carnitine; manganese sulfate; potassium bicarbonate; ascorbyl palmitate; beta-carotene; calcium pantothenate; choline bitartrate; choline chloride; cupric*

---

[6] Whole Foods has discontinued offering some of the Falsely Labeled Artificial Ingredient Products, has altered the packaging, has altered the ingredients, or has selectively marketed the products.  Whole Foods also regularly introduces new products that include artificial ingredients. The identity of these additional products will be ascertained through discovery, and these products are hereby included in the list of "Falsely Labeled Artificial Ingredient Products" at issue in this action.

*sulfate; cyanocobalamin; ergocalciferol; cholecalciferol; folic acid; inositol; niacinamide; phytonadione; pyridoxine hydrochloride; thiamin hydrochloride; thiamine mononitrate; retinyl palmitate;* and *zinc sulfate*, whose nature is more fully alleged above.

b.      *Sodium ascorbate,* classified as a chemical preservative under federal regulations.

c.      *Glyceryl monostearate* and *glyceryl distearate,* synthetic fats, a.k.a. "mono- and diglycerides of fatty acids."  By federal regulation, it is produced from hydrogenated vegetable oils.

d.      *Ammonium bicarbonate*, classified under federal regulations as a synthetic acidity regulator and a hazardous substance.

e.      *Calcium hydroxide,* classified under federal regulations as a synthetic acidity regulator and firming agent.

f.      *Disodium phosphate*, classified under federal regulations as a synthetic preservative produced by the neutralization of phosphoric acid, a synthetic pollutant under federal law.

g.      *Magnesium chloride,* classified under federal regulations as a synthetic flavoring agent and adjuvant.

h.      *Potassium citrate*, classified under federal regulations as a synthetic acidity regulator.

i.      *Potassium acid tartrate,* classified under federal regulations as a synthetic anticaking agent, antimicrobial agent, formulation aid, humectant, leavening agent, pH control agent, processing aid, stabilizer and thickener, and a surface-active agent.

j.      *Sodium phosphate*, classified under federal regulations as a synthetic substance.  It is often used as a preservative, as it inhibits the effects of oxygen on food, increasing the product's shelf life.  It is also used as a synthetic flavor.  Sodium phosphate is generally prepared by the partial or total neutralization of phosphoric acid using sodium carbonate or sodium hydroxide.

k.      ***Xanthan Gum,*** classified under federal regulations as a synthetic stabilizer.

l.      ***Calcium phosphates*** (included in Whole Foods's 365 Organic products as monocalcium phosphate and tricalcium phosphate), classified under federal regulations as synthetic substances.  They are often used as a preservative, as they inhibit the effects of oxygen on food, increasing the product's shelf life.   They are synthetically produced by treating pulverized phosphate rock with sulfuric acid and phosphoric acid, or by treating calcium hydroxide with phosphoric acid, both synthetics.

m.      ***Calcium chloride,*** an artificial sequestrant and firming agent.  Food-grade calcium chloride is produced synthetically by one of three methods.   It can be produced synthetically by the Solvay process, which reacts ammonia and ammonium chloride, both hazardous substances, and calcium hydroxide, a synthetic substance.   It can be produced synthetically by reacting hydrochloric acid (a hazardous substance) and calcium carbonate. Calcium chloride can also be produced by refining brine, employing synthetic chemicals in the purification process.   The EPA has promulgated regulations specifically addressing the environmental impact of calcium chloride produced through brine extraction. In this process, brine is pumped from underground salt beds and is treated with chlorine gas, a synthetic material, which oxidizes bromide to bromine, both toxic chemicals.  Limestone is then heated to produce calcium oxide, changing the molecular structure of the limestone, rendering it synthetic. The lime is added to the brine solution, creating synthetic magnesium hydroxide.  Some of the synthetic lime remains in the final calcium chloride product.

n.      ***Silicon dioxide***, a.k.a. synthetic amorphous silica, classified under federal regulations as a synthetic anti-caking agent.   It is a known human respiratory toxicant, muscoskepeltal toxicant, immune system toxicant, and a possible human renal and cardiovascular toxicant.

o.      **Sodium citrate,** classified under federal regulations as a synthetic acidity regulator. It is prepared by neutralizing citric acid with sodium hydroxide (also a synthetic compound) or sodium carbonate.

p.      **Sodium alginate,** classified under federal regulations as a synthetic flavor enhancer, flavor adjuvant, stabilizer, and emulsifier.

q.      **Sodium acid pyrophosphate,** classified under federal regulations as a synthetic emulsifier.   Its production requires thermally-produced phosphoric acid, an environmental pollutant that increases toxic heavy metals in plants and marine life.  Sodium acid pyrophosphate is produced by the incomplete decomposition of monobasic sodium phosphate (a synthetic compound) or by partial neutralization of phosphoric acid (a synthetic pollutant) with sodium hydroxide (a synthetic and hazardous substance) or sodium carbonate to form monosodium phosphate (a synthetic compound), and then dehydrated at high temperatures

r.      **Potassium hydroxide,** classified under federal regulations as a synthetic stabilizer and acidity regulator.  It is also a toxic compound, and is classified as a hazardous substance under federal law. It is a by-product of hydrochloric acid and chlorine manufacturing.

s.      **Carbon dioxide,** classified under federal regulations as a synthetic acidity regulator.

t.      **Glycerin**, classified under federal regulations as a synthetic substance. Glycerin is produced through various extensive means using synthetic and/or hazardous substances, including epichlorohydrin (hazardous), sodium hydroxide (synthetic and hazardous), allyl alcohol (synthetic and hazardous), hydrogen peroxide (synthetic), and peracetic acid (synthetic).

u.      **Ferrous lactate,** classified under federal regulations as an artificial food color.  It is artificially prepared by reacting calcium lactate or sodium lactate with ferrous sulfate, direct reaction of lactic acid with iron filings, reaction of ferrous chloride with sodium lactate, or reaction of ferrous sulfate with ammonium lactate.

v.      ***Ferrous sulfate*** classified under federal regulations as   a synthetic subtsance.   It is synthetically produced by treating iron with sulfuric acid.

w.      ***Maltitol,*** a.k.a. 4-O-α-glucopyranosyl-D-sorbitol, an artificial sweetener and humectant (*i.e.*, it prevents foods from drying out).   It is produced by Corn Products Specialty Ingredients (formerly SPI Polyols), Cargill, Roquette, and Mitsubishi Shoji Foodtech, among other companies.

x.      ***Sorbitan monostearate***, also known as synthetic wax.

y.      ***Ascorbic acid,*** classified under federal regulations as a synthetic substance and a chemical preservative.   Ascorbic acid does not have the same positive health benefits as natural vitamin C.   For example, natural vitamin C is associated with a lower risk of most types of cancer.   Yet evidence from most randomized clinical trials suggests that vitamin C supplementation does not affect cancer risk.

z.      ***Nitrous oxide,*** a.k.a. "laughing gas," classified under federal regulations as a synthetic propellant. It is made by the action of zinc on dilute nitric acid, by the action of hydroxylamine hydrochloride on sodium nitrite, and, most commonly, by the continuous thermal decomposition of high purity ammonium nitrate, a common ingredient used in fertilizers and explosives, and by the separation from adipic acid off gas.   It can also be a potent greenhouse gas.

aa.      ***Magnesium sulfate***, classified under federal regulations as a flavor enhancer, prepared by neutralization of magnesium oxide, hydroxide, or carbonate with sulfuric acid and evaporating the solution to crystallization.

bb.      ***Calcium lactate,*** classified under federal regulations as a flavor enhancer or flavor adjuvant, made by reacting lactic acid with calcium carbonate or calcium hydroxide.

cc.      ***Polysorbate 80,*** a.k.a. polyoxyethylene (20) sorbitan monooleate, is an artificial emulsifier, a mixture of polyoxyethylene ethers of mixed partial oleic acid esters of sorbitol anhydrides and related compounds.

dd.     ***Autolyzed yeast extract*** is an artificial flavoring agent containing free glutamates found in monosodium glutamate (MSG), an ingredient on Whole Foods's Unacceptable Ingredient List.  *See* Exhibit 3.  It is made by raising the temperature of a yeast cell suspension until the yeast cells die but their hydrolytic enzymes remain active.  After the autolysis, the cell-wall material is separated, and the extract is evaporated to a paste or spray dried to a powder.  Whole Foods also adds other ***yeast extracts*** and yeast products to its private label products, including ***torula yeast*** and ***inactive yeast***, which are also artificial flavor enhancers that contain free glutamates.

ee.     ***Ferric orthophosphate,*** classified under federal regulations as a synthetic substance.  It is produced by reacting sodium phosphate (a hazardous substance) with ferric chloride (also a hazardous substance) or ferric citrate.  By a 2007 directive, the European Union has banned it from being added to foods.

ff.     ***Potassium chloride,*** classified under federal regulations as an artificial flavor enhancer or flavoring agent.  It is produced through fractional crystallization or flotation.  The EPA has promulgated regulations specifically addressing the environmental impact of potassium chloride production.  Food-grade potassium chloride often contains additional synthetic substances as anti-caking agents, such as tricalcium phosphate, silicon dioxide, or magnesium hydroxide carbonates.

gg.     Whole Foods adds a number of ***cellulose*** ingredients to its private label products, including ***carboxymethyl cellulose (a.k.a. "cellulose gum"), methylcellulose,*** and ***powdered cellulose.***  Cellulose is classified by federal regulations as a synthetic substance. According to the USDA, cellulose is the main component of higher plant cell walls.  It is often formed from organic plants, such as cotton and wood.  It is also formed by some algae, fungi, bacteria, and marine animals.  Cellulose is produced by using either a sulfite or alkali process (dilute sodium hydroxide or sodium sulfate), and then bleaching and alkali extraction to develop products with the desired molecular weight and physical length of the fibers.  To meet the specifications required for food ingredients, the cellulose must be purified and bleached.

Bleaching may include up to twelve steps of chlorination, hypochlorite bleaching, chlorine dioxide bleaching, and extraction with concentrated sodium hydroxide along with intermediate alkaline extraction after each oxidative stage.  Purification may involve addition of surfactants in another hot weakly alkaline extraction step after chlorination, or treating the pulp with another bath of 6-10% sodium hydroxide after the bleaching is finished.  Final stages in most purification plants include the use of sulfuric acid and optional chelating agents.

hh.    To produce *carboxymethyl cellulose* (a.k.a. "cellulose gum") and *methylcellulose,* both ingredients in Whole Foods' private label products, highly purified cellulose (over 99% alpha cellulose) is required, and a more drastic chemical modification of the cellulose molecule is required.  Carboxymethyl cellulose is synthesized by the alkali-catalyzed reaction of cellulose with chloroacetic acid.  Methylcellulose is synthetically produced from cellulose by conversion to alkali cellulose and then reacting this with methyl chloride, dimethyl sulfate, or methanol and dehydrating agents.

ii.    *Pectin*, classified under federal regulations as a synthetic substance.

jj.    *Tocopherols* are classified by federal regulations as chemical preservatives and synthetic substances.  They are produced by molecular distillation, solvent extraction, or absorption chromatography.

kk.    Other artificial ingredients include, by way of example, *biotin, riboflavin* (synthetic color); *tricalcium citrate* (synthetic acidity regulator, sequestrant, and firming agent); and *artificial sweeteners* (including inverted sugar syrups).

89.    Whole Foods promises its customers that its products contain no artificial colors.  According to federal regulations, "artificial color" is any substance that is derived from  a vegetable, animal, mineral or other source that imparts a color to a food.  21 C.F.R. § 101.22(a)(4) (defining "artificial color" as any "color additive"); 21 C.F.R. § 70.3(f) (defining "color additive").  Stating its policy, the FDA explains, "[s]ince all added colors result in an artificially colored food, we would object to the declaration of any added color as 'food' or 'natural.'"  FDA Compliance Policy Guide Sec. 587.100.

90.     However, Whole Foods' private label products contain various artificial colors, including, by way of example only, **titanium dioxide** and **zinc oxide**.

91.     The Whole Foods products containing GMOs are also falsely labeled, as GMOs are, by definition, artificial.

92.     GMOs have created controversy around the world due to concerns about food safety, the effect on natural ecosystems, gene flow (a/k/a "gene migration" or "genetic drift") into non-GMO crops, and other issues.

93.     Natural breeding can take place only between closely related life forms, *e.g.*, wheat with wheat.  Natural breeding techniques cannot add the genes of a different organism, *e.g.*, adding fish genes to wheat.  Instead, to add genes of an organism to a different species, scientists must use genetic engineering, producing an organism that could not otherwise exist in nature.  Whole Foods itself admits that genetic modification "produces new combinations of genes and traits that do not occur in nature."  Exhibit 5.

94.     Testing done by an independent lab hired by Plaintiffs' counsel confirms that Whole Foods' private label products contain genes of a bacteria (*Agrobacterium tumefaciens*) and a virus (cauliflower mosaic virus, or CaMV).  Naturally existing agricultural genes could never obtain the genes of a virus or a bacteria, just as wheat could never have the genes of a fish.  Such breeding is unnatural.

95.     The virus and bacteria genes that were added to the Whole Foods private label products are known as "promoters" and "terminators" enabling other foreign genes to be activated.  The source of these other foreign genes is still being ascertained.  In the past, for example, corn has been engineered with mouse genes, jellyfish genes, hepatitis virus genes, rabies virus genes, chicken genes, and even human genes.[7]

---

[7] *See, e.g.*, USDA APHIS Permit Nos. 98-117-01r (corn genetically engineered to express human hemoglobin protein chains); 98-117-02r (human procollagen type chain protein); 98-117-03r (human serum albumin protein); 98-117-04r (rabies virus G glycoprotein); Nat. Biotech. 18: 670-674 (chicken gene).

96.     Reasonable consumers would agree that such genetically modified organisms are unnatural.  For example, scientists have genetically engineered corn with jellyfish genes so the corn would glow in the dark.  Reasonable consumers would believe that glow-in-the-dark corn is not natural corn, but artificial or man-made corn.

97.     The genetically modified organism is fundamentally different from naturally existing crops.  Inserting foreign genes will alter even the original genes, just as inserting a new letter can alter the meaning of a word.  The foreign genes will reduce or increase the natural gene's functions, and sometimes block its expression altogether.   These unexpected consequences can yield alterations in the nutritional content of the food, toxic and allergenic effects, poor crop performance, and generations of environmental damage.

98.     These artificial, manmade plants are also "synthetic" under the federal definition, as they were formulated or manufactured by a chemical process or by a process that chemically changes a substance.

99.     Reasonable consumers also understand that genetically modified ingredients are *not* natural.  Indeed, surveys show that a majority of consumers believe the term "natural" implies the absence of genetically modified ingredients.[8]

100.    Whole Foods has concealed the nature, identity, source, and/or method of preparation of additional ingredients, which may also be artificial ingredients, including, by way of example only: carrageenan (a sulfated polysaccharide); sodium bicarbonate (especially if produced using the more prevalent Solvay process method); whey products (which may include hydrogen peroxide and free D-glutamic acid), tartaric acid; and others.  Thus, discovery is necessary to uncover the true nature of other ingredients in Whole Foods' private label products.

---

[8] *See* Canada Organic Trade Association, *Consumer Confusion About the Difference: "Natural" and "Organic" Product Claims* (2010), at 6, *available at* http://www.ocpro.ca/docs/Library/White%20Paper%20Nat-Org%20COTA.pdf (citing The Hartman Group, *Beyond Organic and Natural* (2010), *available at* http://www.hartman-group.com/publications/reports/beyond-organic-and-natural).

101.   Whole Foods also adds unspecified "***cultures***" to some of its products, concealing the identity, source, and nature of these ingredients, and failing to identify the substrate, violating federal law.  21 C.F.R. § 101.4(b)(5).

102.   Whole Foods also adds "***penicillium***" to some of its private label products, also not identifying the species used.

103.   Whole Foods injects "***natural flavor***" in some of products, concealing from consumers the identity, source, or nature of these ingredients.  While "natural flavors" must be *derived* from a "spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof," it remains unknown whether the processing used to derive the "flavor" from the natural source renders the final ingredient so heavily processed that it can no longer be considered to be a "natural" ingredient.

104.   Whole Foods also falsely, misleadingly, and deceptively represents that an ingredient is the same as a specific naturally-occurring substance, when, in fact, the ingredient is chemically distinct, compounding the falsity of their misrepresentations.

105.   For example, Whole Foods falsely represents that some of the Falsely Labeled Products contain "cyanocobalamin (vitamin B12)," though the substance is not vitamin B12, has a different molecular structure from vitamin B12, and is not a vitamin.  Cyanocobalamin ($C_{63}H_{88}CoN_{14}O_{14}P$) is chemically and molecularly distinct from natural vitamin B12 (cobalamin, $C_{62}H_{88}CoN_{13}O_{14}P$).

106.   Whole Foods knows that consumers believe that natural vitamins have better absorption rates and/or are otherwise superior to synthetic vitamin supplements.

107.   Whole Foods has discontinued offering some of the Whole Foods Artificial Ingredient Products, has altered the ingredients of some, or might introduce new products that contain one or more artificial ingredients and that, therefore, are hereby included in the list of "Whole Foods Artificial Ingredient Products" at issue in this action.  The identity of these additional products will be ascertained through discovery.

**THE REPRESENTATIONS ARE FALSE, DECEPTIVE, AND MISLEADING**

108.    Whole Foods' conduct deceived and/or was likely to deceive the public. Consumers were deceived into believing that the listed ingredients are not artificial, are "natural," and/or are permitted in foods labeled "organic."  Instead, these ingredients were added to the foods, are foreign substances to these foods, are known or suspected toxins, carcinogens, and/or environmental hazards, and are not reasonably expected by consumers to be added to the foods.

109.    Consumers would not know the true nature of the ingredients merely by reading the ingredient label.  Discovery of the true nature of the ingredients requires investigation beyond the grocery store and knowledge of food chemistry and federal regulations beyond that of the average reasonable consumer.

**WHOLE FOODS' DECEPTIVE AND MISLEADING OMISSIONS**

110.    Whole Foods deceptively and misleadingly conceals other material facts about the Falsely Labeled 365 Organic Products, the Falsely Labeled GMO Products, the Falsely Labeled Artificial Ingredient Products, and the Falsely Labeled Unnatural Ingredient Products (collectively, "Falsely Labeled Products"), including:

a.       the true nature of the Falsely Labeled Product's ingredients;

b.       the identity, source, or nature of the ingredients labeled as "natural flavors," "natural flavoring," and/or "flavoring;"

c.       that the Falsely Labeled Products contain artificial substances, synthetic substances; substances that are synthetically manufactured, or are produced or processed using synthetic ingredients, artificial ingredients, toxins, carcinogens, pollutants, genetically modified organisms, and/or hazardous substances;

d.       that the Falsely Labeled Products are not "natural" under Whole Foods' publicized definition of "natural,"

e.       that the Falsely Labeled Products  are not what a reasonable consumer would consider to be "natural;"

f.      that the Falsely Labeled Product did not contain ingredients claimed, such as natural vitamins, or ingredients from the natural source of the flavor claimed, such as "natural butter flavor" in a non-dairy product.

111.   Whole Foods deceptively and misleadingly conceals other material facts about the Falsely Labeled 365 Organic Products, the Falsely Labeled GMO Products, the Falsely Labeled Artificial Ingredient Products, and the Falsely Labeled Unnatural Ingredient Products (collectively, "Falsely Labeled Products"), including:

112.   Plaintiffs, by and through their attorneys, discovered Whole Foods' wrongs in August 2012 through investigation of the food production processes of the ingredients and the packages of the Falsely Labeled Products.  Plaintiffs and the members of the Class are not at fault for failing to discover the Whole Foods' wrongs earlier, and had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice.

113.   To this day, Whole Foods continues to conceal and suppress the true nature, identity, source, and method of production of some of the ingredients in the Falsely Labeled Products.

114.   The production process Whole Foods uses for these ingredients is known only to Whole Foods.  Whole Foods has refused to disclose such information to Plaintiffs and the Class members.  These facts are not ascertainable and are still not known to Plaintiffs, the Class members, and reasonable consumers.  Whole Foods' concealment tolls the applicable statute of limitations.

**WHOLE FOODS KNEW THE REPRESENTATIONS WERE FALSE**

115.   Whole Foods knew what representations it made regarding the Falsely Labeled Products.  Whole Foods also knew what ingredients were added to each product, as (presumably) all product ingredients are listed on the product packages.

116.   Whole Foods is governed by and knows the federal regulations that control the labeling of the Falsely Labeled Products, and thus was aware that many of the ingredients are not

permitted in organic foods, have been federally declared to be synthetic substances, and/or require extensive processing to be used as a food ingredient.

117.    Whole Foods holds itself out to the public as a trusted expert in the natural food arena.  Whole Foods has also retained expert nutritionists, food chemists, and other scientists for its "Scientific and Medical Advisory Board," and has spent much time and money in marketing its expertise in organic requirements and food ingredient chemistry.

118.    Whole Foods thus knew all the facts demonstrating that its Falsely Labeled Products contain artificial ingredients, ingredients prohibited in organic foods, and/or ingredients listed in its own Unacceptable Ingredient List.  Whole Foods thus knew that the Falsely Labeled Products are falsely labeled.

**WHOLE FOODS INTENDED FOR CONSUMERS TO RELY ON ITS MISREPRESENTATIONS**

119.    Whole Foods made the false, deceptive, and misleading representations and omissions, intending for Plaintiffs and the Class members to rely upon these representations and omissions in purchasing and ingesting one or more of the Falsely Labeled Products.

120.    In making the false, misleading, and deceptive representations and omissions at issue, Whole Foods knew and intended that consumers would pay a premium for natural products, organic products, products that are free of artificial additives and other ingredients listed in its Unacceptable Ingredient List,  furthering Whole Foods' private interest of increasing sales of its products and decreasing the sales of the all-natural and/or organic products that are truthfully marketed by Whole Foods' competitors.

121.    In fact, Whole Foods admits that consumers generally pay a premium for organic products.  *See, e.g.,* Exhibit 17.

122.    Similarly, independent surveys confirm that consumers pay a premium for organic products.  Independent surveys further show that consumers will pay an even greater premium for natural products.

## CONSUMERS REASONABLY RELIED ON WHOLE FOODS'
## MISREPRESENTATIONS

123.    Whole Foods also admits that consumers shop at Whole Foods in reliance upon Whole Foods' promises regarding the nature of its products' ingredients.  Whole Foods believes its message has been communicated to its customers so well that it ascribes its "quality standards" as the basis for consumers' decision to buy Whole Foods products.

124.    For instance, in signed federal filings, Whole Foods publicly states, "We believe our strict quality standards differentiate our stores from other supermarkets and enable us to attract and maintain a broad base of loyal customers."   2011 Whole Foods Annual Report at 4. Whole Foods similarly admits, "We believe that many customers are concerned about health and nutrition, food safety, fair trade, and the environment, and choose to shop at our stores for these reasons."  *Id.* at 10.

125.    Consumers frequently rely on food label representations and information in making purchase decisions.

126.    When Plaintiffs and the Class members purchased the Falsely Labeled Products, Plaintiffs and the Class members saw the false, misleading, and deceptive representations detailed above, and did not receive disclosure of the facts concealed, as detailed above.

127.    Plaintiffs and the Class members were among the intended recipients of Whole Foods' deceptive representations and omissions.

128.    Plaintiffs and the Class members reasonably relied to their detriment on Whole Foods' misleading representations and omissions.

129.    Whole Foods' false, misleading, and deceptive misrepresentations and omissions deceived and misled, and are likely to continue to deceive and mislead, Plaintiffs, the Class members, reasonable consumers, and the general public.

130.    Whole Foods' misleading affirmative statements further obscured what Whole Foods failed to disclose.   Thus, reliance upon Whole Foods' misleading and deceptive representations and omissions may be presumed.

131.   Whole Foods made the deceptive representations and omissions with the intent to induce Plaintiffs and the Class members to purchase the Falsely Labeled Products.  Plaintiffs' and the Class members' reliance upon such representations and omissions may be presumed.

132.   Whole Foods' deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.  Thus, Plaintiffs' and the Class members' reliance upon such representations and omissions may be presumed as a matter of law.  The materiality of those representations and omissions also establishes causation between Whole Foods' conduct and the injuries sustained by Plaintiffs and the Class members.

**WHOLE FOODS' WRONGFUL CONDUCT CAUSED PLAINTIFFS' INJURY**

133.   As an immediate, direct, and proximate result of Whole Foods' false, misleading, and deceptive representations and omissions, Whole Foods injured Plaintiffs and the Class members in that they:

a.   paid a sum of money for a product that was not as represented;

b.   paid a premium price for a product that was not as represented;

c.   were deprived the benefit of the bargain because the Falsely Labeled Products they purchased were different from what Whole Foods warranted;

d.   were deprived the benefit of the bargain because the Falsely Labeled Products they purchased had less value than what was represented by Whole Foods;

e.   did not receive a product that measured up to their expectations as created by Whole Foods;

f.   ingested a substance that was other than what was represented by Whole Foods;

g.   ingested a substance that Plaintiffs and the members of the Class did not expect or consent to;

h.   ingested a product that was artificial, synthetic, or otherwise unnatural;

i.      ingested a product that did not bring the health benefits Whole Foods promised;

j.      without their knowing consent, ingested a substance that is generally harmful to their health, their children's health, or their unborn fetus's health;

k.      without their knowing consent, ingested a substance that is, contains, or is produced by a known or suspected toxin, carcinogen, hazardous substance, poses health or environmental risks, or otherwise is harmful to the environment and/or the factory workers that produce or process such substances;

l.      ingested a substance that was of a lower quality than what Whole Foods promised;

m.      were denied the benefit of knowing what they ingested;

n.      were forced to unwittingly support an industry that contributes to environmental, ecological, or health damage, and conversely, were denied the benefit of supporting an industry that sells all-natural foods and contributes to environmental sustainability;

o.      were denied the benefit of the beneficial properties of the all-natural foods promised.

134.   Had Whole Foods not made the false, misleading, and deceptive representations and omissions, Plaintiffs and the Class members would not have been injured as listed above. Accordingly, Plaintiffs and the Class members have suffered "injury in fact" as a result of Whole Foods' wrongful conduct.

135.   Plaintiffs and the Class members all paid money for the Falsely Labeled Products. However, Plaintiffs and the Class members did not obtain the full value of the advertised products due to Whole Foods' misrepresentations and omissions.   Plaintiffs and the Class members purchased, purchased more of, or paid more for, the Falsely Labeled Products than they would have had they known the truth about the Falsely Labeled Products.   Accordingly, Plaintiffs and the Class members have suffered "injury in fact" and lost money or property as a result of Whole Foods' wrongful conduct.

**WHOLE FOODS BENEFITTED FROM ITS MISLEADING AND**

**DECEPTIVE REPRESENTATIONS AND OMISSIONS**

136.    As the intended, direct, and proximate result of Whole Foods' false, misleading, and deceptive representations and omissions, Whole Foods has been unjustly enriched through more sales of Falsely Labeled Products and higher profits at the expense of Plaintiffs and the Class members.  As a direct and proximate result of its deception, Whole Foods also unfairly obtained other benefits, including the higher value associated with a "natural and organic foods" brand and the resulting higher stock value.

**CLASS ALLEGATIONS**

137.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following nationwide class (the "Class"):

> All persons in the United States who purchased Whole Foods' Falsely Labeled Products (as defined herein) from November 28, 2008, to the date of certification of the Class (the "Class Period").

138.    In the alternative to certifying the Class, Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of sub-classes of consumers residing in states that have consumer protection and/or unfair trade practice statutes substantially identical in all relevant respects (the "State Statutory Sub-Class").

139.    In the alternative to certifying the Class or the State Statutory Sub-Class, Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following sub-classes:

> All Texas residents who purchased Whole Foods' Falsely Labeled Products (as defined herein) in Texas during the Class Period (the "Texas Sub-Class");

> All California residents who purchased Whole Foods' Falsely Labeled Products (as defined herein) in California during the Class Period (the "California Sub-Class").

140.     Excluded from the Class and the California Sub-Class are officers and directors of Whole Foods; members of the immediate families of the officers and directors of Whole Foods; Whole Foods' legal representatives, heirs, successors, or assigns; and any entity in which they have or have had a controlling interest.

141.     Plaintiffs bring the Class and the California Sub-Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

142.     At this time, Plaintiffs do not know the exact number of members of the Class or the California Sub-Class; however, given the nature of the claims and the number of Whole Foods' retail stores selling the Falsely Labeled Products, Plaintiffs believe that there are approximately hundreds of thousands of members and that joinder of all of them is impracticable.

143.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class and the California Sub-Class that predominate over questions that may affect individual members include:

a.     Whether Whole Foods labeled, marketed, advertised, and/or sold the Falsely Labeled Products to Plaintiffs and the other members of the Class and the California Sub-Class using false, misleading, and/or deceptive statements or representations, including statements or representations concerning the nature, quality, and/or ingredients of the Falsely Labeled Products;

b.     Whether Whole Foods omitted and/or misrepresented material facts in connection with the sales of the Falsely Labeled Products;

c.     Whether Whole Foods participated in and pursued the common course of conduct complained of herein; and

d.     Whether Whole Foods' labeling, marketing, advertising, and/or selling of the Falsely Labeled Products constitutes an unfair or deceptive consumer sales practice.

144.    Plaintiffs' claims are typical of those of the Class and the California Sub-Class because Plaintiffs, like all members of the Class and the California Sub-Class, purchased the Falsely Labeled Products, relying on Whole Foods' false and misleading representations in a typical consumer setting at a premium price and sustained damages from Whole Foods' wrongful conduct.

145.    Plaintiffs will fairly and adequately protect the interests of the Class and the California Sub-Class because Plaintiffs are similarly situated with, and have suffered similar injuries as, the members of the Class and the California Sub-Class they seek to represent. Plaintiffs feel that they have been deceived, wish to obtain redress of the wrong, and want Whole Foods stopped from perpetrating similar wrongs on others.    Plaintiffs are adequate representatives of the Class and the California Sub-Class also because their interests do not conflict with the interests of the Class members and California Sub-Class members they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation, who led the investigation uncovering Whole Foods' wrongs, who were the first to publicly uncover Whole Foods' wrongs, who have no interests adverse to those of the Class members or the California Sub-Class members, and who can and will vigorously prosecute this litigation.

146.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.    Specifically, no member of the Class or the California Sub-Class has a substantial interest in individually controlling the prosecution of a separate action. The damages suffered by each individual Class member likely will be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Whole Foods' conduct.    Thus, it would be virtually impossible for the Class members individually to effectively redress the wrongs done to them.

147.    Upon information and belief, there are no pending lawsuits concerning this controversy.  Concentration of the litigation concerning this matter in this Court is desirable; and the Class is of a moderate size and the difficulties likely to be encountered in the management of

a class action are not great.  The resolution of the claims of all Class members and California Sub-Class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation.

148.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Federal Rule of Civil Procedure 23(b)(2) are met, as Whole Foods has acted or refused to act on grounds generally applicable to the Class and the California Sub-Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole and the California Sub-Class as a whole.

149.    The prosecution of separate actions by members of the Class or the California Sub-Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Whole Foods.

150.    Whole Foods' conduct is generally applicable to the Class as a whole and the California Sub-Class as a whole and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole and the California Sub-Class as a whole.  As such, Whole Foods' systematic policies and practices make declaratory relief with respect to the Class as a whole and the California Sub-Class as a whole appropriate.

151.    The Class and the California Sub-Class are specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action.  Because Whole Foods is both the manufacturer of its private label products and its own retailer, notice to the Class and the California Sub-Class can be made through various means, such as in-store leaflets, website advertisements, notices on the labels of the packages, and/or direct notice to those consumers for which Whole Foods knows the e-mail or physical mailing address.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violation of the California Organic Products Act)

**(on behalf of the California Sub-Class)**

152.     The allegations in each Cause of Action are repeated and realleged in every other Cause of Action as if set forth in full therein.

153.     This action is brought pursuant to the California Organic Products Act of 2003 ("COPA"), Cal. Health & Safety Code §§ 110810-110959.

154.     Plaintiffs are each a "person" as that term is defined in COPA, Cal. Health & Safety Code § 111910(a).

155.     Whole Foods has violated and continues to violate the provisions of COPA, Cal. Health & Safety Code § 110820, as described above.

156.     COPA provides for injunctive relief for any violation of COPA and affords standing to "any person" to enforce such violations.  *See* Cal. Health & Safety Code § 111910(a).

157.     COPA further provides that actions for injunctive relief to remedy violations of COPA are not subject to the same restrictions as other actions for injunctive relief.  Specifically, COPA provides that "the person shall not be required to allege facts necessary to show, or tending to show, lack of adequate remedy at law, or to show, or tending to show, irreparable damage or loss, or to show, or tending to show, unique or special individual injury or damages." *Id.*

158.     Thus, Plaintiffs are entitled to preliminary and permanent injunctive relief to restrain Whole Foods' violations of COPA.  Cal. Health & Safety Code § 111910(a).

159.     THEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CAUSE OF ACTION

**(Violation of the California Consumers Legal Remedies Act)**

**(on behalf of the State Statutory Sub-Class and the California Sub-Class)**

160.     This cause of action is brought pursuant to the California Consumers Legal Remedies Act (the "CLRA"), Cal. Civ. Code § 1750 *et seq.*, on Plaintiffs' behalf and on behalf of the California Sub-Class.

161.    This cause of action does not seek monetary damages at this point but is limited solely to injunctive relief.  Plaintiffs sent Whole Foods notice pursuant to California Civil Code § 1782 on November 28, 2012.  Since then, Plaintiffs and Whole Foods have engaged in active communications and exchange of information in an attempt to resolve the matter    However, negotiations came to an impasse when Whole Foods refused to provide relief for their CLRA violations.

162.    Plaintiffs and the other members of the California Sub-Class are "consumers," as the term is defined by California Civil Code § 1761(d), because they bought the Falsely Labeled Products for personal, family, or household purposes.  The named defendants are all "person[s]" under Cal. Civ. Code § 1761(c).

163.    The Falsely Labeled Products are "goods" under Cal. Civ. Code § 1761(a). Plaintiffs, the other members of the California Sub-Class, and Whole Foods have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

164.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purposes of the CLRA, and the conduct was undertaken by Whole Foods in transactions intended to result in, and which did result in, the sale of goods to consumers.

165.    Whole Foods' false and fraudulent representations and omissions have violated, and continue to violate the CLRA because they extend to transactions that are intended to result, or have resulted, in the sale of goods to consumers, including the Plaintiffs and the Class members.

166.    Whole Foods' conduct violates Cal. Civ. Code § 1770(a)(5), which prohibits "[r]epresenting that goods . . . have . . . characteristics [or] ingredients . . . which they do not have," and Cal. Civ. Code § 1770(a)(7), which prohibits: "[r]epresenting that goods . . . are of a particular standard, quality, or grade . . . if they are of another," causing injury to Plaintiffs and the Putative Class.

167.    As a result of engaging in such conduct, Whole Foods has violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

168.    Plaintiffs and the other members of the California Sub-Class seek punitive damages, preliminary injunctive relief, and permanent injunctive relief against Whole Foods' unfair and deceptive acts and conduct.

169.    Plaintiffs and the other members of the California Sub-Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

170.    The unfair and deceptive acts and practices of Whole Foods, as described above, present a serious threat to Plaintiffs and the other members of the California Sub-Class.

171.    THEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION

**(Violation of the California False Advertising Law)**

**(on behalf of the State Statutory Sub-Class and the California Sub-Class)**

172.    This cause of action is brought pursuant to California's False Advertising Law (the "FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*, on Plaintiffs' behalf and on behalf of the California Sub-Class.

173.    Such acts of Whole Foods, as described above, and each of them constitute unlawful business acts and practices.

174.    At all material times, Whole Foods engaged in a scheme of offering the Falsely Labeled Products for sale to Plaintiffs and the other members of the California Sub-Class by way of distributing within the State of California to the public, *inter alia*, commercial marketing and advertising, the World Wide Web (Internet), Falsely Labeled Product packaging and labeling, and other promotional materials and offered for sale the Falsely Labeled Products on a nationwide basis, including in California.

175.    The misrepresentations and non-disclosures by Whole Foods of the material facts detailed above constitute false and misleading advertising, and therefore constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

176.    Said advertisements and inducements were made within the State of California and come within the definition of advertising contained in the FAL in that such promotional materials were intended as inducements to purchase Whole Foods' Falsely Labeled Products and are statements disseminated by Whole Foods to Plaintiffs and the other California Sub-Class members that were intended to reach Plaintiffs and the other California Sub-Class members. Whole Foods knew, or in the exercise of reasonable care should have known, that these representations were misleading and deceptive.

177.    Consumers, including Plaintiffs and the other California Sub-Class members, necessarily and reasonably relied on these materials concerning Whole Foods' Falsely Labeled Products. Consumers, including Plaintiffs and the other California Sub-Class members, were among the intended targets of such representations.

178.    The above acts of Whole Foods did and were likely to deceive reasonable consumers, including Plaintiffs and the other members of the California Sub-Class, by obfuscating the nature, quality, and/or ingredients of the Falsely Labeled Products, in violation of the "misleading" prong of the FAL.

179.    The business practices alleged above are unlawful under the CLRA, which forbids misleading and deceptive advertising.

180.    Plaintiffs and the other members of the California Sub-Class have suffered injury in fact and have lost money or property as a result of Whole Foods' violations of the FAL.

181.    As a result, Whole Foods have been unjustly enriched at the expense of Plaintiffs and the other members of the California Sub-Class. Plaintiffs and the California Sub-Class, pursuant to California Business and Professions Code § 17535, are entitled to an order of this Court enjoining such future conduct on the part of Whole Foods, and such other orders and judgments which may be necessary to disgorge Whole Foods' ill-gotten gains and restore to any person in interest any money paid for its Falsely Labeled Products as a result of the wrongful conduct of Whole Foods.

182.    THEREFORE, Plaintiffs pray for relief as set forth below.

**FOURTH CAUSE OF ACTION**

**(Violation of the California Unfair Competition Law)**

**(on behalf of the State Statutory Sub-Class and the California Sub-Class)**

183.    This cause of action is brought pursuant to California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, on Plaintiffs' behalf and on behalf of the California Sub-Class.

184.    By committing the acts and practices alleged herein, Whole Foods has engaged in deceptive, unfair, and unlawful business practices in violation of the UCL.

185.    Plaintiffs have standing to pursue this claim as they have suffered injury in fact and have lost money or property as a result of Whole Foods' actions as set forth above.  Class members also have suffered injury in fact and have lost money or property as a result of Whole Foods' actions as set forth above.

186.    The violation of any law constitutes an "unlawful" business practice under Cal. Bus. & Prof. Code § 17200.

187.    Each of Whole Foods' false representations alleged herein violates 21 U.S.C. § 343; 21 U.S.C. § 331; Cal. Civ. Code § 1709; Cal. Civ. Code § 1750 *et seq.*; Cal. Com. Code § 2313; Cal. Com. Code § 2315; and Cal. Bus. & Prof. Code § 17500 *et seq.*

188.    Each of Whole Foods' false representations alleged herein also violates California's criminal laws.  Cal. Penal Code § 383 (forbidding the offering for sale food that is adulterated, e.g., "by any means it is made to appear better or of greater value than it really is").

189.    Whole Foods has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of (i) the CLRA, as alleged above, and (ii) the FAL, as alleged above.

190.    In addition, Whole Foods has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of the Sherman Law, Cal. Health & Safety Code § 109875 *et seq.*, which forbids (1) misbranding of any food or drug, *id.* at §§ 110398 and 111445, and (2) manufacturing, selling, delivering, holding, or offering for sale any food or drug

that is misbranded or delivering or proffering such for delivery.  Cal. Health & Safety Code §§ 110390, 110395, 110398, 110400, 110550, 110585, 110620, 110625, 110660, 110770, 110705, 110740, 110760, 110765, 110770, 111445, and 111450

191.    In relevant part, the Sherman Law declares that food is misbranded if its labeling is false or misleading in any particular way and further provides that it is unlawful for any person to misbrand any food.  California Health & Safety Code §§ 110660 and 110765.

192.    The Sherman Law defines a "person" as "any individual, firm, partnership, trust, corporation, limited liability company, company, estate, public or private institution, association, organization, group, city, county, city and county, political subdivision of this state, other governmental agency within the state, and any representative, agent, or agency of any of the foregoing."  Cal. Health & Safety Code § 109995.  The named defendants are "persons" within the meaning of the Sherman Law.

193.    As more fully described herein, Whole Foods' misleading marketing, advertising, packaging, and labeling of the Falsely Labeled Products is likely to deceive a reasonable consumer.  Indeed, Plaintiffs and the other California Sub-Class members were unquestionably deceived regarding the characteristics of Whole Foods' Falsely Labeled Products, as Whole Foods' marketing, advertising, packaging, and labeling of the Falsely Labeled Products misrepresents and/or omits the true nature, quality, and/or ingredients of the Falsely Labeled Products.

194.    There is no benefit to consumers or competition from deceptively marketing and labeling products.  Indeed, the harm to consumers and competition is substantial.  Plaintiffs and the other members of the California Sub-Class who purchased the Falsely Labeled Products suffered a substantial injury as alleged herein.

195.    Plaintiffs and the other members of the California Sub-Class who purchased the Falsely Labeled Products had no way of reasonably knowing that the Falsely Labeled Products they purchased were not as marketed, advertised, packaged, and labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

196.    Whole Foods' acts and omissions alleged above constitutes unfairbusiness practices under Cal. Bus. & Prof. Code § 17200 because the gravity of the consequences of Whole Foods' conduct as described above outweighs any justification, motive, or reason therefor, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other members of the California Sub-Class.  Whole Foods' false and misleading representations and omissions also violate legislatively declared policy as they have violated numerous state and federal laws. Moreover, the gravity of the harm to Plaintiffs and Class members resulting from Whole Foods' conduct outweighs Whole Foods' legitimate reasons, justifications and/or motives for engaging in such deceptive acts and practices

197.    Each false and misleading representation and omission constitutes fraudulent business practices under Cal. Bus. & Prof. Code § 17200 because the representations and omissions were false.  Even if these representations were true, Whole Foods' representations and deceptive concealment were nonetheless fraudulent under the statute because they were misleading and were likely to and did deceive the reasonable consumer, including Plaintiffs and the Class members.

198.    Whole Foods' violations of the UCL continue to this day.

199.    Pursuant to California Business and Professions Code § 17203, Plaintiffs and the other members of the California Sub-Class seek an order of this Court that includes, but is not limited to, an order enjoining such future conduct on the part of Whole Foods and such other orders and judgments which may be necessary to disgorge Whole Foods' ill-gotten gains and to restore to any person in interest any money paid for Whole Foods' Falsely Labeled Products as a result of the wrongful conduct of Whole Foods.

200.    THEREFORE, Plaintiffs pray for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Breach of Express Warranty)

**(on behalf of the Class, the State Statutory Sub-Class, the Texas Sub-Class, and the California Sub-Class)**

201.    This cause of action is brought on Plaintiffs' behalf and on behalf of the nationwide Class and the California Sub-Class, pursuant to Texas law for the Class and pursuant to California law for the California Sub-Class.

202.    Whole Foods provided Plaintiffs and other members of the Class and the California Sub-Class with written express warranties including, but not limited to, warranties that its Falsely Labeled Products were "organic," contained no artificial ingredients, contained no GMOs, and contained no ingredients listed in its Unacceptable Ingredient List, as set forth above.

203.    These affirmations of fact or promises by Whole Foods relate to the good and became part of the basis of the bargain.

204.    Plaintiffs and members of the Class purchased the Falsely Labeled Products, believing them to conform to the express warranties.

205.    Whole Foods breached these warranties.  This breach resulted in damages to Plaintiffs and other members of the Class and the California Sub-Class, who bought Falsely Labeled Products but did not receive the goods as warranted.

206.    As a proximate result of the breach of warranties by Whole Foods, Plaintiffs and the other members of the Class and the California Sub-Class did not receive goods as warranted. Plaintiffs and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.  Among other things, Plaintiffs and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiffs and the Class members known the true facts, they either would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Whole Foods charged for the products.

207.    THEREFORE, Plaintiffs pray for relief as set forth below.

**SIXTH CAUSE OF ACTION**

**(Breach of Implied Warranty of Merchantability)**

**(on behalf of the Class, the State Statutory Sub-Class, the Texas Sub-Class, and the**

**California Sub-Class)**

208.   This cause of action is brought on Plaintiffs' behalf and on behalf of the nationwide Class and the California Sub-Class, pursuant to Texas law for the Class and pursuant to California law for the California Sub-Class.

209.   Whole Foods impliedly warranted that the Falsely Labeled Products conformed to the promises or affirmations of fact as detailed above.  Whole Foods thereby impliedly warranted that the products were merchantable and fit for the ordinary purposes for which such goods are used and would conform to the promises or affirmations of fact made in the Falsely Labeled Products' promotions, marketing, advertising, packaging, and labels.

210.   Whole Foods did so with the intent to induce Plaintiffs and the Class members purchase the Falsely Labeled Products.  Plaintiffs and the other members of the Class and the California Sub-Class relied on Whole Foods' representations that the Falsely Labeled Products had particular characteristics, as set forth above, and, at or about that time, Whole Foods sold the Falsely Labeled Products to Plaintiffs and the other members of the Class and the California Sub-Class.

211.   Whole Foods breached the warranty implied at the time of sale in that Plaintiffs and the other members of the Class and the California Sub-Class did not receive goods that were as represented and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, advertised, packaged, labeled, or sold.

212.   Whole Foods had prior knowledge and notice of the true nature of the Falsely Labeled Products and, therefore, its breach of the warranty, but took no action to remedy the inferiority or to cure the breach.

213.   As a proximate result of the breach of warranties by Whole Foods, Plaintiffs and the other members of the Class and the California Sub-Class did not receive goods as warranted. Plaintiffs and the members of the Class therefore have been injured and have suffered damages

in an amount to be proven at trial.  Among other things, Plaintiffs and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiffs and the Class members known the true facts, they either would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Whole Foods charged for the products.

214.    THEREFORE, Plaintiffs pray for relief as set forth below.

## SEVENTH CAUSE OF ACTION

**(Breach of Implied Warranty of Fitness for Particular Purpose)**

**(on behalf of the Class, the State Statutory Sub-Class, the Texas Sub-Class, and the California Sub-Class)**

215.    This cause of action is brought on Plaintiffs' behalf and on behalf of the nationwide Class and the California Sub-Class, pursuant to Texas law for the Class and pursuant to California law for the California Sub-Class.

216.    Plaintiffs and the other members of the Class and the California Sub-Class purchased Whole Foods' Falsely Labeled Products, which were promoted, marketed, advertised, packaged, and labeled as alleged above. In so doing, Whole Foods impliedly warranted that the Falsely Labeled Products conformed to the promises or affirmations of fact as detailed above. Plaintiffs and the other members of the Class and the California Sub-Class bought the Falsely Labeled Products from Whole Foods relying on Whole Foods' skill and judgment in furnishing suitable goods as well as its representation that the Falsely Labeled Products conformed to the promises or affirmations of fact, as set forth above.

217.    Whole Foods breached the warranty implied at the time of sale in that Plaintiffs and the other members of the Class and the California Sub-Class did not receive Falsely Labeled Products as represented, and thus the goods were not fit for the purpose as promoted, marketed, advertised, packaged, labeled, or sold.

218.    As a proximate result of the breach of warranties by Whole Foods, Plaintiffs and the other members of the Class and the California Sub-Class did not receive goods as warranted.

Plaintiffs and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.  Among other things, Plaintiffs and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiffs and the Class members known the true facts, they either would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Whole Foods charged for the products.

219.    THEREFORE, Plaintiffs pray for relief as set forth below.

## EIGHTH CAUSE OF ACTION

**(Deceit and/or Misrepresentation, Fraudulent Concealment, and Constructive Fraud, in Violation of Common Law and Cal. Civ. Code §§ 1709, 1573 *et seq.*)**

**(on behalf of the Class, the State Statutory Sub-Class, the Texas Sub-Class, and the California Sub-Class)**

220.    This cause of action is brought on Plaintiffs' behalf and on behalf of the Class and the California Sub-Class, pursuant to Texas law for the Class and pursuant to California law for the California Sub-Class.

221.    Whole Foods falsely and fraudulently represented to the public, including Plaintiffs and Class Members, those false representations listed above.  Whole Foods also fraudulently concealed from the public, including Plaintiffs and Class Members, those material facts listed above.  These misrepresentations and omissions constitute deceit under Cal. Civ. Code § 1710.

222.    Whole Foods knew that these misrepresentations are false and that their omissions are fraudulent and deceptive, but nonetheless misrepresented and concealed these facts to induce Plaintiffs and the Class members to act in reliance on the misrepresentations and omissions and purchase the Falsely Labeled Products.

223.    Whole Foods intentionally made the false representations and intentionally concealed and suppressed these material facts with the intent to defraud the Plaintiffs and the Class.  Whole Foods made these false representations and omissions to make the Falsely Labeled

Products appear more attractive to consumers.  Whole Foods knew and intended that Plaintiffs and the members of the Class would rely on Whole Foods' representations and omissions and purchase the Falsely Labeled Products. Whole Foods thereby violated Cal. Civ. Code § 1709.

224.    Plaintiffs and the other members of the Class and the California Sub-Class would have acted differently had they not been misled – *i.e.*, they would not have paid money for the Falsely Labeled Products in the first place and/or  they would not have paid a premium price for the Falsely Labeled Products over similar products.

225.    Whole Foods has a duty to correct the misinformation it disseminates through its advertising of the Falsely Labeled Products.  By not informing Plaintiffs and the other members of the Class and the California Sub-Class, Whole Foods breached this duty.  Whole Foods also gained financially from, and as a result of, this breach.  Moreover, Whole Foods has a duty to disclose the omitted facts because it was in possession of knowledge about the identity, formulation, and production of the Falsely Labeled Products and of their ingredients, and this information is not reasonably available to consumers.  By not disclosing the material facts to Plaintiffs and other members of the Class, Whole Foods breached this duty.

226.    Whole Foods gained an advantage by these fraudulent representations and omissions.

227.    These misrepresentations and omissions were material.  A reasonable person would attach importance to the existence or nonexistence of these representations in determining whether to purchase the Falsely Labeled Products.

228.    Plaintiffs and the other members of the Class and the California Sub-Class justifiably and reasonably relied on Whole Foods' misrepresentations, and, as such, were damaged by Whole Foods.  Plaintiffs and the other Class members were unaware of the truth of these misrepresentations and these concealed facts and would have not acted as they did had they known the truth.

229.    As a direct and proximate result of Whole Foods' deceits and/or misrepresentations, Plaintiffs and the other Class and California Sub-Class members have

suffered damages in an amount equal to the amount they paid for Whole Foods' Falsely Labeled Products.  The exact amount of these damages will be proven at trial.

230.  Whole Foods acted with intent to defraud, or with reckless or negligent disregard of the rights of, Plaintiffs and the other Class and California Sub-Class members, and did so with fraud, oppression, and malice.

231.  Plaintiffs and the Class and California Sub-Class members are entitled to punitive damages.

232.  THEREFORE, Plaintiffs pray for relief as set forth below.

<u>**NINTH CAUSE OF ACTION**</u>

**(Unjust Enrichment)**

**(on behalf of the Class, the State Statutory Sub-Class, the Texas Sub-Class, and the California Sub-Class)**

233.  This cause of action is brought on Plaintiffs' behalf and on behalf of the nationwide Class and the California Sub-Class, pursuant to Texas law for the Class and pursuant to California law for the California Sub-Class.

234.  As a result of Whole Foods' deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of the Falsely Labeled Products, Whole Foods was enriched at the expense of Plaintiffs and the other members of the Class and the California Sub-Class through the payment of the purchase price for Whole Foods' Falsely Labeled Products.

235.  Under the circumstances, it would be against equity and good conscience to permit Whole Foods to retain the ill-gotten benefits that it received from Plaintiffs and the other members of the Class and the California Sub-Class, in light of the fact that the Falsely Labeled Products purchased by Plaintiffs and the other members of the Class and the California Sub-Class were not what Whole Foods purported them to be.  Thus, it would be unjust or inequitable for Whole Foods to retain the benefit without restitution to Plaintiffs and the other members of the Class and the California Sub-Class for the monies paid to Whole Foods for such Falsely Labeled Products.

236.    THEREFORE, Plaintiffs pray for relief as set forth below.

## TENTH CAUSE OF ACTION

### (Negligence and Negligent Misrepresentations)

### (on behalf of the Class, the State Statutory Sub-Class, the Texas Sub-Class, and the California Sub-Class)

237.    This cause of action is brought on Plaintiffs' behalf and on behalf of the nationwide Class and the California Sub-Class, pursuant to Texas law for the Class and pursuant to California law for the California Sub-Class.

238.    Whole Foods had a duty to use due care in formulating, labeling, marketing, advertising, and selling its products.  Whole Foods breached that duty.  Whole Foods' false and misleading representations detailed above were negligently made without any reasonable grounds for believing it was true.

239.    Whole Foods made the negligent misrepresentations intending to induce consumers' reliance on the facts misrepresented and matters concealed.  Plaintiffs and other consumers saw, believed, and relied on Whole Foods' misrepresentations and, in justifiable reliance on them and as a result of them, purchased the Falsely Labeled Products.

240.    Whole Foods is also negligent due to their violation of statutes and regulations referenced above.  Their violation proximately caused Plaintiffs and Class member's injury, their injury being the type that the statutes and regulations were designed to prevent, and these consumers being within the class of persons for whose protection the statutes and regulations were adopted.

241.    As a proximate and actual result of Whole Foods' negligence and negligent representations, Plaintiffs and the Class have suffered damages in an amount not presently known, but which will be shown by proof at time of trial,

242.    THEREFORE, Plaintiffs pray for relief as set forth below.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment on behalf of themselves and the proposed Class and California Sub-Class providing such relief as follows:

A.      Certification of the nationwide Class and the California Sub-Class proposed herein under Federal Rule of Civil Procedure 23(a) and (b)(3); appointment of Plaintiffs as representatives of the Class and the California Sub-Class; and appointment of their undersigned counsel as counsel for the Class and the California Sub-Class;

B.      A declaration that Whole Foods is financially responsible for notifying members of the Class and the California Sub-Class of the pendency of this suit;

C.      Restitution to the California Sub-Class pursuant to California Business and Professions Code §§ 17203 and 17535;

D.      Disgorgement to the California Sub-Class pursuant to California Business and Professions Code §§ 17203 and 17535;

E.      Damages, together with costs and disbursements, including reasonable attorneys' fees, pursuant to the applicable statutes;

F.      Injunctive relief on behalf of the California Sub-Class pursuant to California Health and Safety Code § 111910(a), California Business and Professions Code §§ 17203 and 17535, and California Civil Code § 1780, enjoining Whole Foods' unlawful and deceptive acts;

G.      Monetary damages, including, but not limited to any compensatory, incidental, or consequential damages in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law with respect to the common law claims alleged;

H.      Statutory damages in the maximum amount provided by law;

I.      Punitive damages in accordance with proof and in an amount consistent with applicable precedent;

J.      An award to Plaintiffs and the other Class and California Sub-Class members of the reasonable costs and expenses of the lawsuit, including their attorneys' fees;

K.      An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Whole Foods as a result of the unfair, misleading, fraudulent and unlawful conduct alleged herein; and

L.      Such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs and the Class members hereby demand a trial by jury.

Dated: November 27, 2013

**THE GOLAN FIRM**

Yvette Golan
Attorney in Charge
Texas Bar No. 24053229
S.D. Tex. No. 1439846
1919 Decatur St.
Houston, Texas 77007
Telephone:      (866) 298-4150, ext. 101
Facsimile:      (928) 441-8250
Email: ygolan@tgfirm.com

**REESE RICHMAN LLP**

Michael R. Reese (*pro hac vice to be filed*)
Kim E. Richman (*pro hac vice to be filed*)
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Telephone:      (212) 643-0500
Facsimile:      (212) 253-4272
Email: mreese@reeserichman.com
           krichman@reeserichman.com

*Counsel for Plaintiffs and the Proposed Class*

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Gedalia, Uri; Lewis, Kira; and Fink, Deborah, on behalf of themselves and others similarly situated

**(b)** County of Residence of First Listed Plaintiff: Harris County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
The Golan Firm
1919 Decatur St., Houston, TX 77007
(866) 298-4150

**DEFENDANTS**

Whole Foods Market Distribution, Inc., Whole Foods Market IP, L.P., Whole Foods Market Services, Inc., WFM IP Management, Inc., WFM Private Label, L.P., WFM Private Label Management, Inc.

County of Residence of First Listed Defendant: Travis County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Seyfarth Shaw LLP
560 Mission St., Suite 3100, San Francisco, CA 94105
(415) 397-2823

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☒ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**V. ORIGIN** *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: 28 U.S.C 1332(d)(2)(A)

Brief description of cause: Misrepresentation of consumer goods

**VII. REQUESTED IN COMPLAINT:** ☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** 5000000

CHECK YES only if demanded in complaint: **JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):* JUDGE DOCKET NUMBER

DATE SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**